NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0380n.06

No. 09-3719

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jun 24, 2010**
LEONARD GREEN, Clerk

DALE BECKETT,                                          )
                                                       )
      Plaintiff-Appellant,                       )
                                                       )
v.                                                     )
                                                       )
JACK FORD, Mayor of Toledo; STEVEN                     )
FORRESTER, Sergeant, Toledo Police                     )
Department; HARRY BARLOS, Commissioner of              )
Lucas County; TINA SKELDON WOZNIAK,                    )
Commissioner of Lucas County; MAGGIE                   )
THURBER, Commissioner of Lucas County;                 )
CHRIS ANDERSON, Assistant County Prosecutor,           )    ON APPEAL FROM THE
aka James Anderson; GARY CROFT, Chairman,              )    UNITED STATES DISTRICT
Ohio Adult Parole Authority; JIM BEDRA, Parole         )    COURT FOR THE
Board Member, Ohio Adult Parole Authority;             )    NORTHERN DISTRICT OF
SANDRA CROCKETT, Board Member, Ohio                    )    OHIO
Adult Parole Authority; PETER DAVIS, Board             )
Member, Ohio Adult Parole Authority;                   )
KATHLEEN KOVACH, Board Member, Ohio                    )    O P I N I O N
Adult Parole Authority; ROBERT                         )
MASZCZYNSKI, Board Member, Ohio Adult                  )
Parole Authority; CYNTHIA B. MAUSER, Board             )
Member, Ohio Adult Parole Authority; BETTY             )
MITCHELL, Board Member, Ohio Adult Parole              )
Authority; REGINALD WILKINSON, Director,               )
Ohio Department of Rehabilitation and                  )
Correction; JESSE WILLIAMS, Warden, Allen              )
Correctional Institution,                              )
                                                       )
      Defendants-Appellees.                      )

BEFORE:    SUHRHEINRICH, McKEAGUE, and GRIFFIN, Circuit Judges.

**McKEAGUE, Circuit Judge.** Following a successfully habeas petition, Dale Beckett, who had previously been convicted in Ohio state court of the 1996 murder of drug dealer Ronald Cunningham, brought actions against numerous defendants from the City of Toledo, Lucas County, and the State of Ohio under 42 U.S.C. § 1983 and Ohio law. As the centerpiece of his case, Beckett claimed that various individuals conspired with a key witness to frame him. Following the grant of summary judgment to all state defendants, and Beckett's voluntarily dismissal against three of the County defendants, the district court was left with Beckett's claims against Lucas County Assistant Prosecutor Christopher Anderson, Toledo Mayor Jack Ford, and Toledo Police Sergeant Steven Forrester. On September 28, 2007, the district court granted Anderson's motion for summary judgment; on May 11, 2009, the district court granted Ford and Forrester's motion for summary judgment. Beckett now appeals, arguing that the court improperly cloaked Forrester and Anderson with absolute prosecutorial immunity and ignored several critical affidavits.[1] As almost all of the statements in the affidavits on which Beckett relies are inadmissible hearsay, as Anderson was protected from liability for any alleged wrongdoing by absolute prosecutorial immunity, and as there was probable cause for Beckett's prosecution, we affirm the district court's award of summary judgment to both Anderson and Forrester.

---

[1]At oral argument, Beckett's counsel stated that he was abandoning all arguments as to Ford. Accordingly, we affirm the judgment in favor of Ford, and consider only whether the district court erred in granting summary judgment to Anderson and Forrester.

**I.**

Ronald Cunningham, a suspected drug dealer, was shot to death in Toledo, Ohio on February 17, 1996; Toledo Police Sergeant Steven Forrester was assigned as the lead investigator into Cunningham's murder. Around May 5, 1996, Dale Beckett, who had been convicted of an unrelated weapons charge, entered prison in Ohio. In prison, he encountered Matthew Williams, allegedly a long-time acquaintance, who had entered prison on February 25, 1996 after violating parole. According to police reports, in May of 1996 Williams called Forrester from prison, and stated that he had information in the case. Forrester interviewed Williams on June 7, 1996, at which time (again according to police reports) Williams told Forrester about a plot by Phil Spivey, the manager of a car wash, to hire Beckett to kill Cunningham. According to his notes, Forrester also spoke with Reginald Atkins, who stated that he had seen Beckett in the area of the murder earlier in the evening, and Norma Eaton, who stated that she had seen Beckett run past her on the night of the murder. Beckett was indicted on September 30, 1996, in part on the basis of testimony from Williams and Eaton, for committing murder in violation of OHIO REV. CODE § 2903.02.

Beckett's trial began in February of 1997. In a decision in 2000, the Ohio Court of Appeals summarized some of the evidence from trial:

> Ouida Gordon, Cunningham's girlfriend, testified that Cunningham had been unemployed and sold drugs to support himself. Gordon further testified that [Beckett], Cunningham, and she had often socialized together and sometimes with Tony Pierson. She last saw Cunningham on February 16, 1996. He left her mother's house around 1:30 p.m., acting nervous, because he owed James Spivey $40. She saw him again around 4:00 p.m. and spoke to him briefly to give him $20 toward the money he needed to pay off his debt. Cunningham was standing on the corner of Prospect and Detroit Avenues in his usual area for selling drugs. She saw him again early the next morning from 1:30 to 2:30 a.m. at a friend's home. On

cross-examination, however, she testified that Cunningham stayed until 3:30 or 4:00 a.m. Cunningham left to get some drugs while Gordon slept on the couch. Gordon testified that Cunningham called her about one week before his death and told her how [Beckett] had hunted him down to collect on a debt. He further told her that he had given [Beckett] a greenish-tan trench coat as payment. She testified that [Beckett] also had disagreements with others over drug deals.

Anthony Pierson testified that he is currently imprisoned and has had twelve or thirteen felony convictions in the past for various theft and related offenses. He testified that [Beckett] and Cunningham would both stay with Pierson on occasion. Pierson recalled that Cunningham owed [Beckett] money in January 1996. The two had a heated conversation about the money on Pierson's front porch. The debt arose out of a drug deal where Cunningham either messed up or deliberately kept the profits. Prior to this time, [Beckett] had argued with Cunningham about money he owed a friend of appellant. [Beckett] was looking for Cunningham in January 1996, and Pierson sent him to a mission where Cunningham was staying. [Beckett] took some of Cunningham's clothes he found in Pierson's home as "collateral." The next day, they came to Pierson's house and the argument seemed to be resolved. Pierson also testified that he was a passenger in [Beckett's] car in mid-January 1996, the evening of the argument between [Beckett] and Cunningham on the porch. During the ride, Pierson observed a .25 semiautomatic pistol under the front seat arm rest in [Beckett's] car. When Pierson questioned [Beckett] about carrying a gun while under a disability, he stated that he would always carry one.

Matthew Williams, a long-time acquaintance of [Beckett], testified regarding statements [Beckett] had made regarding killing Cunningham. Williams is currently imprisoned for a parole violation and has had several felony and misdemeanor convictions. He testified that [Beckett] stopped him about 1:00 p.m. on February 14 or 15, 1996, and followed Williams to a car wash to talk to him. When Williams got into [Beckett's] car, [Beckett] and Phil, the owner of the car wash, were already in the car. Phil was telling [Beckett] that he wanted Cunningham dead for messing up something concerning money and drugs. Phil was trying to describe Cunningham for [Beckett] because [Beckett] did not know him. As they were talking, Cunningham came out of a nearby convenience store. [Beckett] got out of the car and started walking toward Cunningham and then returned to the car and said "Don't worry about it. That nigger dead." Phil then gave [Beckett] half an ounce of crack cocaine as a partial payment. [Beckett] never did talk to Williams about what [Beckett] had said he wanted to talk to Williams about.

[Beckett] called Williams again on February 21, 1996 about 10:00 or 10:30 a.m. asking for some drugs. During the conversation, he said, "Ain't nobody got to worry

about that one thing no more." When Williams inquired further what that meant, [Beckett] said, "That nigger, Cunningham, he dead." Williams arranged to meet [Beckett] that evening to give him some drugs. When Williams approached his house around the appointed time, he saw someone crouched down low beside the house. Williams yelled at the person who then ran. Williams got in his car and chased the person. He saw a car leaving the alley without its lights on and followed it. When he caught up with the car, he found out it was [Beckett]. [Beckett] said that Williams had scared him because he thought Williams was the police. Williams never did give [Beckett] any drugs. Williams returned to prison on a parole violation four days later. Williams saw appellant again in prison. Williams questioned [Beckett] about the rumors on the street that he killed Cunningham. [Beckett] stated that he would kill his mother for the right price. [Beckett] admitted that he was coming home one night and saw Cunningham. [Beckett] stopped Cunningham, made him put his hands in his pockets, and then shot him in the head. Williams testified that he first heard about Cunningham having his hands in his pockets from [Beckett]; but, on cross-examination, admitted that it was general knowledge in the neighborhood. [Beckett] also admitted to Williams that he was hanging around Williams' house that evening in February intending to rob the man Williams was going to hook him up with to buy drugs. [Beckett] intended to shoot the man because [Beckett] knew that the man was not the type to just give up anything. [Beckett] admitted that he was going to shoot Williams too. After hearing that, Williams called Detective Forrester to tell him that [Beckett] had admitted to killing Cunningham.

*State v. Beckett*, L-97-1073, 2000 WL 234564, at *1-*3 (Ohio Ct. App. Mar. 3, 2000). During the trial, Williams also testified that he had not been "promised anything" and that he was not "being given any special treatment for rendering [his] testimony," even though both Forrester and Anderson had agreed to write a letter to Williams' parole board attesting to Williams' cooperation. *Beckett v. Haviland*, 76 F. App'x 726, 726 (6th Cir. 2003) (per curiam). During the trial, Anderson did nothing to correct Williams' false testimony. *Id.*

> Norma Eaton testified that she knew Cunningham because they lived in the same area at one time. She did not know [Beckett], Anthony Pierson, or Matthew Williams. She testified that she left her home around 3:00 a.m. February 17, 1996. . . . Eaton walked back and forth in the area from 3:05 a.m. until 5:00 a.m. The area was well lit by streetlights. Around 4:00 to 4:30 a.m., she heard a gun shot coming from Prospect Street. She then saw someone run through the field a short distance away. She called

to the person asking him if he wanted a date. He stopped and looked at her and then ran toward the school parking lot. The streetlight shone directly on him, and she could see clearly that he was wearing a black leather hat with a "bib," black leather coat, and either blue or black dark-colored pants. He had a "thick, stocky" build. She identified [Beckett] at trial as the person she had seen just as she had in photo arrays prior to trial. Although she could not give a detailed description regarding the clothing or the man's face, she stated that she could recognize him if she saw him again and was certain that [Beckett] was the man she had seen.

Steven Forrester . . . testified that the police investigation led to [Beckett] by Williams' statements. The detective then obtained a coat and hat from appellant's girlfriend at the end of July 1996, which he showed to Eaton. Eaton immediately recognized the coat and hat and believed that they were actually the coat and hat the man had been wearing. He then showed her a photo array and she immediately and confidently identified [Beckett's] picture as the man she had seen.

*State v. Beckett*, 2000 WL 234564, at *4.

**Williams' Recantation and Affidavit**

Beckett was convicted on February 13, 1997, and was sentenced to 15 years to life with an additional three years for a firearms specification. Following his conviction, Beckett made numerous appeals; while those appeals were ongoing, Williams, who was apparently upset that he had not been released from prison, sent a letter and an affidavit to Julia Bates, the Lucas County Prosecutor, threatening to distribute an affidavit recanting his testimony unless he was immediately released. In the affidavit, Williams stated that he had been threatened by Forrester and bribed by Anderson, and that he had "no prior knowledge of the involvement of Dale Beckett in the murder he now stands convicted of." (R. 30 Attach. 6.)

In response to Williams' affidavit, Beckett filed a motion for a new trial. The state trial court held an evidentiary hearing at which Williams refused to testify, citing his Fifth Amendment privilege against self-incrimination. *State v. Beckett*, 2000 WL 234564 at *8. Forrester, however,

did testify, and stated "that he never threatened Williams and that he only told him to tell the truth,"

and that he "only promised to send the parole board a letter stating that he had cooperated with the

prosecution and testified at trial without any personal benefit." *Id.*

**The Grant of Beckett's Habeas Petition (June 26, 2002)**

After first the state trial court and then the Ohio Court of Appeals denied Beckett's appeals,

Beckett turned to the federal courts. As we later noted:

> After exhausting his direct appeal, Beckett filed a petition for habeas corpus relief .
> . . . On June 26, 2002, the district court granted Beckett's petition for a writ of
> habeas corpus. The district court concluded that Beckett's rights under the Due
> Process Clause of the Fourteenth Amendment were violated because the prosecutor
> failed to correct testimony elicited from a witness that the prosecutor knew was false,
> and there was a reasonable likelihood that the false testimony could have affected the
> judgment of the jury.

*Beckett*, 76 F. App'x at 726. Critically, the federal district court and the Sixth Circuit panel which

affirmed the district court's grant of the habeas petition focused not on Williams' recantation, but

only on the fact that Anderson had failed to correct Williams' testimony about not being offered any

special deals.[2] Following the appeal, we gave the state 90 days from the date of the final order

(October 20, 2003) to either release Beckett or else try him again. The state chose not to try Beckett

again, but continued to hold him in prison on the charge of carrying a concealed weapon while under

a disability. Beckett was ultimately granted parole on March 22, 2004.

---

[2]Beckett continually misrepresents our 2003 decision as a finding that he was innocent or a finding that Anderson, Forrester, and others had violated his constitutional rights *by seeking to frame him*. Obviously, neither the district court nor we went nearly so far.

**The § 1983 Suit and the Focus on Anderson, Forrester, and Ford**

On October 6, 2004, Beckett filed a complaint under 42 U.S.C. § 1983 and Ohio law in the United States District Court for the Southern District of Ohio naming numerous state, county, and local defendants in both their individual and official capacities. Beckett specifically alleged that these defendants: (1) had violated his due process rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; and (2) had violated state laws against bad faith, unlawful imprisonment, and conspiracy. Essentially, Beckett alleged that investigators and prosecutors had colluded to frame him for murder and that state prison officials had violated his constitutional rights by refusing to release him from prison as required by the Sixth Circuit panel. On May 30, 2006, Judge Sargus of the Southern District of Ohio granted summary judgment to all of the state defendants, concluding that the state had appropriately continued to hold Beckett on the still-valid gun conviction. With the agreement of the remaining parties, the case was then transferred to the Northern District of Ohio. On February 22, 2007, Judge Katz of the Northern District granted Beckett's motion to dismiss his claims against three Lucas County commissioners. Beckett's remaining case thus consisted of claims against Anderson, Forrester, and Toledo Mayor Jack Ford, whom Beckett claimed was responsible for training Forrester to abuse his authority and for creating a system in which "convictions are used as a barometer of success without due regard for the means and strategies employed for achieving convictions." (R. 1 at ¶¶ 20-21.)

**Eaton's Affidavit and Depositions and Beckett's Other Evidence**

In bringing his case, Beckett sought to procure testimony regarding what he alleges was the conspiracy to frame him for murder. In an affidavit dated September 26, 2006, transcribed and

notarized by Dion Howells, a private investigator working for Beckett, Norma Eaton stated that the police had encouraged her to lie about the man she saw on the night of the murder, and that the police had coerced and "coached [her] along." (R. 103, Attach. 10 (Eaton Affidavit), at 1-2.) On January 10, 2007, Eaton gave what turned out to be an incomplete deposition, during which she cursed Beckett's attorneys, reiterated that she had seen Beckett the night of the murder, and explained that she had "multiple personalities" and that those deposing her might not be talking to the right personality. Moments later, Eaton stormed out of the deposition. After being appointed counsel, Eaton at a later deposition announced that she was invoking her Fifth Amendment right not to testify, and that she would not testify in the future.

In addition to producing the Williams affidavit and the Eaton affidavit, Beckett produced: his own affidavit reporting his conversations with Williams and alleging that he had suffered hundreds of thousands of dollars of mental anguish; an affidavit from Allison M. Clark, Beckett's former federal defender, who reported Williams' allegations and expressed her concern about Anderson's refusal to concede that he had promised to write Williams a letter in exchange for Williams' testimony; and an affidavit (with attachments) from Howells, the private investigator, who stated that (on the basis of two news articles about an old case and an interview with a lawyer for a witness in that case who recanted her testimony) he had concluded that the Toledo Police Department "made it part of their investigative techniques in murder prosecutions to use perjured testimony in their murder investigations," (R. 74 Attach 8.) Howells' affidavit included an attached 2000 affidavit from Reginald Atkins, who was cited in Forrester's police reports as having seen Beckett on the night of the murder and who, according to Howells, met and became friendly with

Beckett in prison in 1999. In this affidavit, Atkins claims that Forrester lied about meeting with Atkins on June 11, 1996 and that Forrester and Detective James Scott (who was not named in this suit) encouraged Atkins to testify falsely against Beckett. Atkins did not testify at either the Grand Jury or the criminal trial.

**Summary Judgment for Anderson, Ford, and Forrester**

On September 28, 2007, the district court adopted the July 30, 2007 Report and Recommendation of the magistrate judge and granted Anderson's motion for summary judgment as to all claims. Specifically, the district court held that: (1) Anderson was protected by absolute prosecutorial immunity from Beckett's § 1983 claims against Anderson in his individual capacity; (2) Beckett's § 1983 claims against Anderson in his official capacity were barred by the Eleventh Amendment; and (3) Anderson was similarly protected by absolute prosecutorial immunity under Ohio law from Beckett's state claims for unlawful imprisonment and bad faith. Because the district court's decision was interlocutory, Beckett was not able to appeal at that time.

Following the district court's grant of Anderson's motion for summary judgment, Beckett took Forrester's deposition. During this deposition, Forrester stated that he had testified at Beckett's trial that he, Forrester, had not made any promises to Williams and had not threatened Williams. Forrester then stated that, at the evidentiary hearing held in conjunction with Beckett's motion for a new trial, he had testified that Williams had been promised a letter to the parole board from the police department, the prosecutor's office, and the local parole authority reflecting Williams' cooperation. Forrester also testified, for the first time, that following Williams' initial phone call

to police, it was Anderson who went to the prison to determine whether Williams and Beckett had been in sufficient proximity to permit Beckett to confess to Williams.[3]

On May 11, 2009, the district court granted Ford and Forrester's motion for summary judgment as to most claims, though the court, having dismissed all federal claims, declined to exercise supplemental jurisdiction over Beckett's individual capacity state law claim against Forrester. Specifically, the district court held: (1) regarding Beckett's § 1983 claims against Ford and Forrester in their official capacities, Beckett had failed to establish that a custom or policy of the City of Toledo played a part in the violation of federal law; (2) with regard to the § 1983 individual capacity malicious prosecution and civil conspiracy claims, Beckett had failed to plead conspiracy with specificity and Forrester was protected by qualified immunity, as there was probable cause to investigate and prosecute Beckett; and (3) Forrester and Ford were protected from the state law official capacity claims by state immunity under OHIO REV. CODE § 2477.01.

This appeal followed on June 5, 2009. At oral argument, on April 28, 2010, Beckett's attorney stated that he was abandoning his appeal as to Ford.

---

[3]Following this deposition, despite for the first time having evidence that Anderson had engaged in any investigatory (as opposed to prosecutorial) work, Beckett did not ask the district court to reconsider its decision on Anderson's motion for summary judgment. In his appeal, Beckett cites Forrester's deposition to demonstrate that Anderson was acting as an investigator, and therefore should not have been protected by absolute prosecutorial immunity. By failing to raise this argument before the district court, however, Beckett arguably waived use of this evidence. Regardless, despite pointing to the fact that Anderson did some investigating, Beckett does not allege that Anderson engaged in any wrongdoing *as part* of that investigating. Instead, Beckett argues that Anderson acted improperly while preparing Williams to testify.

**II.**

Beckett brought this action in federal court under 42 U.S.C. § 1983; we therefore have jurisdiction over the appeal under 28 U.S.C. § 1291. We review de novo a district court's grant of summary judgment. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Arizona v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**III.**

Before we turn to the question of whether the district court appropriately granted summary judgment to Anderson and Forrester, we first consider the evidence Beckett offered to the district court in opposing the defendants' motions for summary judgment. Beckett argues in part that the district court improperly weighed evidence by discounting the Williams and Eaton affidavits, which

he correctly believes are "the most relevant" to his case. Anderson and Forrester contend that the Williams and Eaton affidavits constitute inadmissible hearsay, and so the district court was in fact required to ignore them at the summary judgment stage. In fact, the district court explicitly declined to address the admissibility at trial of the statements in the Williams and Eaton affidavits.

As a general rule, "evidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence . . . must be disregarded." *Alpert v. U.S.*, 481 F.3d 404, 409 (6th Cir. 2007) (citing *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)). "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). Obviously, an affidavit that is offered to support the claims made by the affiant by its very nature constitutes hearsay evidence. Acknowledging that affidavits often contain important evidence that a court must take into account at the summary judgment stage, however, the Supreme Court has held that the party opposing summary judgment need not "produce evidence *in a form* that would be admissible at trial in order to avoid summary judgment." *Celotex Corp.*, 477 U.S. at 324 (emphasis added) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred."). That said, however, a party opposing summary judgment who proffers evidence in a form not admissible at trial nonetheless "must show that she can make good on the promise of the pleadings by laying out enough evidence *that will be admissible at trial* to demonstrate that a

genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (emphasis added) (citing *Alpert*, 481 F.3d at 409).

We find that almost all of the statements in the Williams and Eaton affidavits are inadmissible as hearsay not subject to any exemption or exception, and that Beckett has failed to show that he could or would produce *admissible* evidence at trial supporting the allegations made in the inadmissible portions of these affidavits. Accordingly, we find that the district court was required to disregard the Williams and Eaton affidavits almost in their entireties.

## A. Williams' Affidavit

The crux of Beckett's claims is that Williams' affidavit demonstrates that Forrester and Anderson conspired to frame Beckett for murder and coerced Williams into testifying. Williams testified extensively at trial regarding Beckett's alleged role in the murder; following the trial, Williams recanted in September of 1997 by sending a letter and an affidavit to the Lucas County Prosecutor. It is this affidavit that Beckett now claims that the district court erroneously disbelieved or ignored. In the affidavit, Williams states:

> 1. I was threatened by Detective Steve Forester that if I refused to testify against Dale Beckett that he would implicate me in the murder;
>
> 2. I had no prior knowledge of the involvement of Dale Beckett in the murder he now stands convicted of;
>
> 3. I was informed by the detective and prosecutor on what to testify to during the Grand Jury and Jury Trial concerning investigative facts in the murder case implicating Dale Beckett by being rehurst [sic] and going over investigative facts in the case;

> 4. I was promised by Prosecuting Attorney, Chris Anderson that if I falsely implicate Dale Beckett in the murder that I would be granted a release from prison;

(R. 103 Attach. 6.) Williams, who is now dead, later refused to testify at an evidentiary hearing, and cited his Fifth Amendment privilege against self-incrimination.

Much of Williams' affidavit is clearly inadmissable hearsay. Beckett offers Williams' affidavit to prove the matter asserted – that Forrester and Anderson coerced and bribed Williams to falsely accuse Beckett. As Williams is dead (and so cannot testify at trial or a hearing), and as the affidavit is the only evidence Beckett can offer regarding Williams' contentions, the information in Williams' affidavit will necessarily *remain* hearsay. Hearsay is not admissible unless it falls within one of the exemptions or exceptions defined by the Federal Rules of Evidence. FED. R. EVID. 802. Beckett argues that Williams' hearsay testimony is admissible as a statement against interest, which is admissible where the declarant is unavailable to testify. *See* FED. R. EVID. 804(b). "Unavailablity of the witness" includes situations where the declarant "is unable to be present or to testify at the hearing because of death . . . ." FED. R. EVID. 804(a)(4). A statement against interest includes any statement which, at the time of its making, "so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." FED. R. EVID. 804(b)(3).

Here, Williams' affidavit in part certainly seems to expose Williams to criminal liability for perjury. That one part of an affidavit is admissible under the statement-against-interest exception does not, however, mean that the *entire* affidavit is admissible. As the Supreme Court has observed, "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement

- 15 -

is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." *Williamson v. U.S.*, 512 U.S. 594, 600 (1994). The Court concluded that Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory. The district court may not just assume . . . that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else." *Id.* at 600-01. "[W]hen ruling upon a narrative's admissibility under this rule, a court must break it down and determine the separate admissibility of each 'single declaration or remark.'" *U.S. v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995) (*quoting Williamson*, 512 U.S. at 604). This means that a court, "when determining the admissibility of a narrative, must examine it sentence by sentence," *id.* at 960, in order to determine what sentences are self-inculpatory and what sentences are collateral.

Of the four declarations Williams made in his affidavit, only the second – that he "had no prior knowledge of the involvement of Dale Beckett in the murder he now stands convicted of" – is in any way self-inculpatory. While Williams' second statement on its face does not admit wrongdoing, because Williams testified at Beckett's murder trial implicating Beckett in the murder, in context it is clear that this statement subjects Williams to charges of perjury and a civil suit from Beckett. (In contrast, Williams' first, third, and fourth declarations are not self-inculpatory, and are therefore inadmissible: Williams did not incur any criminal or civil liability by stating that he was threatened by Forrester, that Forrester and Anderson coached his testimony, or that Anderson promised that he would be released from prison in exchange for testifying falsely.) This means that only Williams' second statement could conceivably be used by Beckett at trial.

Given that these statements in Williams' affidavit constitute inadmissible hearsay, the next question is whether Beckett can show that he "can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander*, 576 F.3d at 558. Here, however, Beckett is depending entirely upon Williams' affidavit to prove Williams' allegations. Beckett, in other words, has produced no *admissible* evidence demonstrating that Anderson, Forrester, or indeed anyone else bribed, coerced, or threatened Williams into testifying falsely. As any inadmissible hearsay offered in opposition to a motion for summary judgment "must be disregarded," *Alpert*, 481 F.3d at 409, we find that the district court, in ruling on the motions for summary judgment, was *required* to disregard all statements in Williams' affidavit other than Williams' claim that he "had no prior knowledge of the involvement of Dale Beckett in the murder he now stands convicted of."

**B. Eaton's Affidavit**

As additional evidence that various government agents, and particularly Forrester, worked to frame him for the murder, Beckett presented an affidavit from Norma Eaton, the prostitute who testified that she had seen Beckett running near the scene of the murder, stating that her trial testimony had been coached and coerced. The history of Eaton's statements is somewhat complicated: after being interviewed by the police, she identified Beckett for a grand jury on September 30, 1996. She then testified at Beckett's trial. On September 26, 2006, she was tracked down by Dion Howells, Beckett's investigator, who witnessed her affidavit, which read:

> [Howells] Q. On 2-17-96 when interviewed by Det. S. Forrester what did the police ask you.

[Eaton] A. They asked me did I see a murder on 3/2/96. I did not see anything however I did hear two gunshots and saw a light skinned Black male run past me, I stopped this male and asked him if he wanted a date to which male said "no" and I left the area.

Q. Did the police come back and speak to you again.

A. Yes, two days later approx 3/4/96. The police had pictures and showed them to me. The police kept pointing to one man while I was pointing to another male. The police showed me the one male they wanted me to identify while I kept pointing to the other male.

Q. Did the police interview you after 3/4/96

A. Yes approx 2 days later the police came back took me outside to the police car and showed me a leather coat, hat and boots. I told them the man I saw had all black on. There was nothing particular about this clothing I could identify.

Q. Did you give testimony to the grand jury on 9/30/96

A. Yes.

Q. Did the police show you a photo prior to your testimony of the person the police wanted you to identify.

A. Yes they showed me the same photo of a Black male which was not the photo I picked out.

Q. Did the police point a Black male out to you prior to your testimony in court.

A. Yes, the [sic] pointed out the male they wanted me to identify.

Q. Did the police coerce your testimony

A. Yes, they coached me along.

Q. Did you have any criminal charges pending against you when the police interviewed you

- 18 -

A. Yes.

Q. Did the police coerce your testimony against Dale Beckett

A. Yes, I had pending charges.

Q. Did the police officers give you any help with your criminal charges

A. Yes, I believe they helped me get out of some of [indecipherable] problems

Q. Did the police offer or give you money.

A. Yes, they gave me twenty dollars several times while this case was going on.

Q. Do you have anything further to this statement.

A. Yes, Dale Beckett is not the Dude I picked out.

(R. 103, Attachment 10, Eaton Affidavit, at 1-3.) Howells also recorded (and had transcribed) his entire conversation with Eaton; that transcript suggests that Eaton, who at the time of the murder was apparently facing various drug and prostitution charges, was saying that she misidentified Beckett after the police promised to contact the judge in her case and state that she was cooperating. After Eaton gave this *ex parte* affidavit, Beckett tried to get her to state her allegations during a deposition. On January 10, 2007, Eaton gave a truncated and bizarre deposition, during which she cursed Beckett's attorneys and alleged that Howells had forced her to say things and had misrepresented himself as an attorney. In part, the transcript of this deposition reads:

Q. [Yelsky, Beckett's attorney]: You were one of the witnesses in Dale Beckett's murder case?

A. [Eaton]: Possibility.

- 19 -

Q. You were --

A. You keep saying, "you." I have multiple personalities. You've got to explain who you're talking to and who you're not talking to. That's the only way you're going to get it.

Q. Okay. Would you prefer I call you Mrs. Eaton?

A. Call me what you wish. If she's here, she'll talk to you. If she ain't, she won't.

Q. Okay, Ms. Eaton, you were one of the witnesses in Dale Beckett's murder case. Am I correct?

A. Yeah, I believe so.

Q. And the night of the shooting or the murder, do you remember what night that was?

A. I don't even remember what today is. How am I going to remember that?

Q. Do you have a poor memory, ma'am?

A. I don't have a memory at all.

Q. Okay. Ma'am, the night of the shooting, did you actually see Dale Beckett around that neighborhood where you were at?

A. I seen him run past me. That's all I seen.

Q. Did you see Dale Beckett?

A. I believe so.

Q. But on the other hand --

A. I can't – I don't know. You know, that who I seen him run past me. Now, whether he did it or didn't do nothing, I don't know. I

> don't know nothing about that. That's the guy I seen run past me that night.
>
> That's all I can say. I don't know nothing else. You can't ask me nothing else because I don't know nothing else. You can't make me say something like that private investigator did.
>
> You know what I'm saying? Basically, I'm through with all this shit on everything, for real. Because you're all irritating the fuck out of me right now.

(R. 103, Attachment 9, Eaton Deposition, at 4-6.) Eaton then stormed out of the deposition room.[4]

Beckett tried several more times to depose Eaton, but after the court appointed an attorney to represent her, Eaton announced that she was exercising her Fifth Amendment rights and refusing to testify, both at the deposition and at any future trial.

Like Williams' affidavit, Eaton's affidavit consists almost entirely of inadmissible hearsay. Clearly, Beckett is offering the affidavit in an attempt to prove that Forrester and other police officers coached and encouraged Eaton to lie when testifying that she had seen Beckett near the scene of the murder. Eaton's statements are therefore not admissible at trial unless a hearsay exception or exemption applies. As a result of her invocation of her Fifth Amendment privilege and stated difficulties remembering anything, Eaton is "unavailable" to testify within the meaning of the Federal Rules of Evidence. FED. R. EVID. 804(a)(1)-(2). The only applicable hearsay exception under which Eaton's affidavit may be admitted is the same exception for statements against interest found in Rule 804(b)(3). As we did with Williams' affidavit, we must therefore break down Eaton's

---

[4]We also note that by storming out during Yelsky's questioning, and thus refusing to complete her deposition, Eaton denied the defendants their right of cross-examination.

affidavit sentence by sentence and determine whether, in context, each declaration or remark is or is not self-inculpatory. *Williamson*, 512 U.S. at 600; *Canan*, 48 F.3d at 959-60.

At trial, Eaton reportedly identified Beckett as the man she saw running through a field in the vicinity of the crime scene when the murder occurred. In her affidavit, however, Eaton states that Beckett "is not the Dude I picked out." Taken in context, Eaton's affidavit statement subjects Eaton to charges of perjury, and is therefore admissible under the statement against interest exception. Similarly, given the context that law enforcement officers already knew that Eaton had engaged in illegal prostitution, Eaton's statement that she solicited the man she saw running through the field for a date is admissible. That said, however, everything else in Eaton's affidavit – and particularly her claims that the police coerced her into mis-identifying Beckett – does nothing to inculpate Eaton. If true, those statements might demonstrate that the police acted inappropriately – but being coerced or threatened did not expose Eaton to civil or criminal liability. Accordingly, the remainder of Eaton's affidavit is hearsay not subject to any exception.

Beckett argues that Eaton's affidavit, even if it constitutes otherwise inadmissible hearsay, should be admitted because the defendants, through wrongdoing, have forfeited the right to object on hearsay grounds. Specifically, Beckett claims that Eaton was "intimidated by the police" into not testifying, and that the police therefore procured Eaton's unavailability. As part of their argument, Beckett's attorneys repeatedly invoke the doctrine of "forfeiture by wrongdoing" and discuss the United States Constitution's Sixth Amendment Confrontation Clause – apparently not realizing that the Confrontation Clause applies only to "criminal prosecutions," rather than civil § 1983 claims. U.S. CONST. Amend. VI. The doctrine of forfeiture by wrongdoing, which has been codified as FED.

R. Evid. 804(b)(6), exempts from the hearsay rule any "statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Although Rule 804(b)(6) was clearly designed with criminal cases in mind, and was intended to prevent defendants from profiting by murdering or harming witnesses, the language of the Rule is broad enough to apply to civil cases. The Supreme Court, moreover, has concluded that the doctrine of forfeiture by wrongdoing applies to the government, as well as to criminal defendants. *See Giles v. California*, 554 U.S. ---, 128 S.Ct. 2678, 2678 (June 25, 2008).

We have held that, in order for the doctrine of forfeiture by wrongdoing to apply and to render admissible what would otherwise be inadmissible hearsay:

> the proponent of the hearsay statement has the burden of persuasion of showing procurement [of unavailability] by a preponderance, but once evidence is produced that demonstrates good reason to believe the defendant has interfered with the witness, adverse inferences may be drawn from the failure of the defense to offer credible evidence to the contrary.

*Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir. 1982). Subsequently, in *Giles*, 128 S. Ct. at 2683, the Supreme Court held that the doctrine applies only "when the defendant engaged in conduct *designed* to prevent the witness from testifying." In other words, "the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable.'" *Id.* at 2687. Therefore, the proponent of a hearsay statement invoking the forfeiture by wrongdoing exception has the burden of showing by a preponderance of the evidence that the party opposing admission of the hearsay statements engaged in conduct designed to procure the unavailability of the witness.

Beckett cannot meet this burden. The only evidence Beckett offers to demonstrate that any of the defendants engaged in conduct designed to procure Eaton's unavailability is: (1) the fact that

Eaton did not, as Beckett apparently expected, testify at deposition that she had been encouraged to lie during Beckett's murder trial; and (2) his allegation, stated in an affidavit, that various people, including Forrester, spoke with Eaton the morning Eaton was supposed to give the deposition – *after* Eaton had already informed Beckett's attorneys that she was not going to testify. According to Beckett's affidavit:

> I did personally observe Norma J. Eaton enter the library with 3 police detectives (the same people that she was suppose to be testifying against; they all gathered together and began to conversate. Detective Steve Forrester, the most culpable defendant in the above captioned case then entered the library. Detective Forrester, Norma J. Eaton, the (3) detectives, Mr. Burrell, and Mr. Fisk huddled together giving the appearance of constructing a gameplan. When Ms. Eaton entered the library with the detectives it was obvious from the look on her face that she'd been intimidated by the police once again into doing the exact same thing she'd done at the Plaintiffs murder trial. Just as I was mentioning to my attorneys of the importance of securing an injunction to protect Ms. Eaton, Ms. Eaton approaches the area where myself and my attorneys were and began frantically speaking as if she was being hunted by gamesmen (with the Toledo police detectives standing directly behind her) Norma J. Eaton began to accuse the Plantiffs investigator (Dion Howells) of misrepresenting himself (which the audio-tape of Ms. Eaton contradicts completely and absolutely) and retracting her confession of truth. She refused to do the video-taped deposition as she had agreed to do and was nervously adamant about not testifying. After disdainfully leaving the proceedings by exiting the conference room, Norma J. Eaton then left the library with the Police Detectives, the very same officers she was suppose to be testifying against.

(R. 78 # 2, Becket 1/12/2007 Affidavit.) Beckett's beliefs regarding the meaning of Eaton's expression upon entering the room and the fact that Eaton, who went on to accuse Beckett's private investigator of making her say something, chose to speak with Forrester and various other police officers, simply do not show by a preponderance of the evidence that Forrester or anyone else engaged in conduct designed to procure Eaton's unavailability or to prevent Eaton from testifying.

As Eaton's affidavit consists almost entirely of inadmissible hearsay, and as Beckett cannot meet the burden of demonstrating, by a preponderance of the evidence, that Forrester, Anderson, or anyone else in any way procured Eaton's unavailability, we find that the district court in ruling on summary judgment was required to disregard everything in Eaton's affidavit other than Eaton's statement that she solicited the man she saw near the murder for a date and the statement that Beckett, against whom she testified, "is not the Dude I picked out."

**IV.**

Having considered the evidence Beckett offered in opposing the defendants' motions for summary judgment, we turn to the question of whether the district court appropriately granted summary judgment to Anderson. Beckett argues that the district court erred by granting Anderson absolute prosecutorial immunity for allegedly fabricating probable cause "during his pre-grand jury and pre-trial investigatory acts." (Beckett Br. at 28.) As almost all of Williams' affidavit is inadmissible hearsay, and as neither Eaton's affidavit nor Atkins' affidavit mentions Anderson at all, there is no admissible evidence even alleging that Anderson did anything more than, as has already been determined, failing to correct Williams' testimony at trial. Regardless, any wrongdoing Anderson is alleged to have done came as Anderson was acting as a prosecutor, and so – even if the Williams and Eaton affidavits were admissible in their entirely – Anderson is protected by absolute prosecutorial immunity. Accordingly, we find that the district court appropriately granted Anderson's motion for summary judgment.

Beckett brought three separate sets of claims against Anderson: (1) § 1983 claims against Anderson in his individual capacity; (2) § 1983 claims against Anderson in his official capacity; and

(3) civil rights claims against Anderson under Ohio law. The district court held that: (1) Anderson was protected by common law absolute prosecutorial immunity from the individual capacity § 1983 claims; (2) Beckett's official capacity § 1983 claims were barred by the Eleventh Amendment; and (3) Anderson was similarly protected by Ohio law absolute prosecutorial immunity from the state claims, which the court construed as claims for unlawful imprisonment and bad faith. In his appeal, Beckett does not mention the Eleventh Amendment – the basis of the district court's opinion as to Beckett's official capacity § 1983 claims against Anderson – at all. "As this court has frequently observed, '[a]n appellant waives an issue when he fails to present it in his initial briefs.'" *LoCoco v. Medical Sav. Ins. Co.*, 530 F.3d 442, 451 (6th Cir. 2008) (citing *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 462 (6th Cir. 2003)). Accordingly, we find that Beckett has waived appeal of the district court's ruling as to his official capacity § 1983 claims, and thus is only appealing judgment of the individual capacity § 1983 claims and the Ohio state law claims.

### A. Individual Capacity § 1983 Claims

In granting summary judgment to Anderson on Beckett's individual capacity § 1983 claims, the district court concluded that Anderson was protected by absolute prosecutorial immunity because all of Anderson's actions were conducted as part of Anderson's prosecutorial work rather than as part of the police investigation. In response, Beckett points to Forrester's deposition, in which Forrester reports that – following the initial phone call from Williams to the police – it was Anderson who went to the prison to determine whether Williams and Beckett were in sufficiently close proximity to permit Beckett to confess to Williams. This was investigatory work, Beckett argues,

and so entitled Anderson to qualified immunity, rather than absolute immunity.[5] Moreover, Beckett

adds, quoting *Gregory v. City of Louisville*, 444 F.3d 725, 739 (6th Cir. 2006), pre-trial acts do not

enjoy absolute immunity.

As the Supreme Court has concluded, the common law principle of absolute immunity for

prosecutors applies to § 1983 claims. *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976). "To be sure,"

the Court explained, "this immunity does leave the genuinely wronged defendant without civil

redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Id*.

Nonetheless, prosecutors are entitled to absolute prosecutorial immunity for any conduct relating to

"initiating a prosecution and . . . presenting the State's case." *Id.* at 431. In contrast, when a

prosecutor "functions as an administrator" or an investigator "'rather than as an officer of the court'

he is entitled only to qualified immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (citing

*Imbler*, 424 U.S. at 431 n.33). In *Spurlock v. Thomson*, we clarified some of the circumstances under

which a prosecutor is said to be acting as a prosecutor rather than as an investigator:

> Since the Court's decision in *Imbler*, courts have taken a functional approach to
> absolute immunity. See *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)
> (looking to the "nature of the function performed, not the identity of the actor who
> performed it"). Using this approach, courts have concluded that a prosecutor is
> protected "in connection with his duties in functioning as a prosecutor." *Id.*
> Accordingly, prosecutors are absolutely immune from many malicious prosecution
> claims. *Burns v. Reed*, 500 U.S. 478, 485 n.4 (citing *Yaselli v. Goff*, 275 U.S. 503

---

[5]We note that Beckett took Forrester's deposition only *after* the district court had already granted Anderson's motion for summary judgment. While Anderson argues that Beckett needed to move for reconsideration at the district court level in order to raise the Forrester deposition as an issue, we need not address this argument, as – even with Forrester's deposition – Beckett has failed to demonstrate that any alleged wrongdoing on Anderson's part came as Anderson was acting as an investigator rather than as a prosecutor.

(1927)). Likewise, absolute immunity is appropriate for claims based on the prosecutor's appearance at a probable cause hearing and before a grand jury. *Id.* at 487 & n.6. Absolute immunity applies to "acts . . . includ[ing] the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Preparation of witnesses for trial is protected by absolute immunity. *Higgason*, 288 F.3d at 878 (discussing *Imbler*'s conclusion that "an out-of-court effort to control the presentation of a witness' testimony was entitled to absolute immunity because it was fairly within the prosecutor's function as an advocate" (modifications in original omitted)). As the Court concluded in *Imbler*, even the knowing presentation of false testimony at trial is protected by absolute immunity. 424 U.S. at 413, 430; *see also Buckley*, 509 U.S. at 267 n. 3 (noting the Seventh Circuit's conclusion that "[p]resenting . . . fabricated evidence to the grand jury and . . . trial jury . . . [are] actions protected by absolute immunity." (citing *Buckley v. Fitzsimmons*, 919 F.2d 1230, 1243 (7th Cir. 1990))).

330 F.3d 791, 797-98 (6th Cir. 2003). In summing up this functional approach, we concluded that "[t]he analytical key to prosecutorial immunity, therefore, is advocacy–whether the actions in question are those of an advocate." *Id.* at 798 (quoting *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000)). The "critical inquiry is how closely related is the prosecutor's challenged activity to his role as an advocate intimately associated with the judicial phase of the criminal process." *Id.*

Beckett's claims against Anderson amount to allegations that Anderson pressured, threatened, and enticed witnesses to lie at Beckett's trial, presented false testimony at that trial, failed to disclose a deal he and Forrester had made with Williams, and conspired with Forrester to frame Beckett for Cunningham's murder. The district court concluded that, in arranging for Williams to testify, and even in failing to correct Williams' testimony, Anderson was acting as an advocate for the state. The district court concluded also that, while it is possible for a prosecutor who engages in a conspiracy to manufacture false evidence not to be acting as an advocate for the state when he does so, in this

case Anderson *was* acting as an advocate for the state, and so was entitled to absolute prosecutorial immunity. The district court was correct: even if Anderson threatened, coerced, or enticed Williams into presenting false testimony, Anderson did so as part of his effort to prosecute Beckett for Cunningham's murder. In other words, despite Beckett's assertion that any fabrication of evidence "occurred during the investigatory phase of Beckett's ordeal," (Beckett Reply Br. at 14), and despite Beckett's assertion that Anderson was engaged in investigation when Anderson checked on whether Beckett and Williams were in proximity in prison, Anderson was acting neither as an investigator nor an administrator when he reviewed with Williams what Williams would say on the stand. This, of course, all quite apart from the fact that, without the portions of Williams' affidavit that constitute inadmissible hearsay, Beckett can present no evidence at all that Anderson fabricated evidence or encouraged Williams to lie.

As to Beckett's argument that absolute immunity does not extend to pre-trial acts: the Supreme Court in *Buckley* spoke to this point, and concluded that pre-trial acts *can* be prosecutorial:

> Petitioner argues that *Imbler's* protection for a prosecutor's conduct "in initiating a prosecution and in presenting the State's case," 424 U.S., at 431, extends only to the act of initiation itself and to conduct occurring in the courtroom. This extreme position is plainly foreclosed by our opinion in *Imbler* itself. We expressly stated that "the duties of the prosecutor in his role as advocate for the State involve actions *preliminary to the initiation of a prosecution* and actions apart from the courtroom," and are nonetheless entitled to absolute immunity. Id., at 431, n.33. We noted in particular that an out-of-court "effort to control the presentation of [a] witness' testimony" was entitled to absolute immunity because it was "fairly within [the prosecutor's] function as an advocate." Id., at 430, n.32.

509 U.S. at 272-273.  In other words, the fact that the encounter between Williams and Anderson took place before trial does not foreclose the possibility that Anderson was acting as an advocate during that encounter, and so was entitled to absolute prosecutorial immunity.

As there is no admissible evidence suggesting that Anderson did anything improper other than fail to correct Williams' testimony at trial, and as in any case Anderson is protected by absolute prosecutorial immunity, we find that the district court did not err in granting Anderson's motion for summary judgment as to the individual capacity § 1983 claims.

### B.  State Law Claims for Unlawful Imprisonment and Bad Faith

First the magistrate judge and then the district court construed Beckett's general, undifferentiated state law claims as claims for unlawful imprisonment and bad faith.  Beckett has not objected to this construction, and has focused only on whether Anderson was entitled to prosecutorial immunity.  Accordingly, we consider whether the district court erred by granting Anderson's motion for summary judgment as to Beckett's state law claims for unlawful imprisonment and bad faith.

The Ohio rules governing prosecutorial immunity mirror the federal rules: in Ohio, "prosecutors are considered 'quasi-judicial officers' entitled to absolute immunity granted judges, when their activities are 'intimately associated with the judicial phase of the criminal process.'" *Willitzer v. McCloud*, 453 N.E.2d 693, 695 (Ohio 1983) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).  A prosecutor's absolute immunity is similarly subject to the same restrictions: "absolute immunity does not extend to a prosecutor engaged in essentially investigative or administrative functions." *Id.* (citing *Dellums v. Powell*, 660 F.2d 802, 805 (D.C. Cir. 1981)).  While

performing these functions, a prosecutor in Ohio is entitled to only a qualified immunity. *Id.* The question under Ohio law, then, is whether a prosecutor's actions were sufficiently quasi-judicial to be covered by absolute prosecutorial immunity. As the district court noted, the Ohio Court of Appeals has held (in an unpublished case) that a prosecutor was entitled to absolute immunity even where he "allegedly intimidated [a witness] into signing an affidavit implicating Appellants," as the prosecutor was still operating in his prosecutorial role. *Bender v. Diemert*, 62206, 1993 WL 127091, at *4-*5 (Ohio Ct. App. Apr. 22, 1993). Beckett, in contrast, cites no Ohio case law suggesting that Anderson was acting *outside* his quasi-judicial role by taking any of the actions alleged by Beckett.

As none of Williams' allegations against Anderson are admissible at trial (and as Anderson is not even mentioned in Eaton's affidavit), Beckett again cannot demonstrate that Anderson has done anything wrong other than fail to correct Williams' testimony at trial. Even if Beckett *could* demonstrate that Anderson had coerced or conspired to coerce Williams into framing Beckett, moreover, Anderson's conduct was sufficiently quasi-judicial to be shielded by absolute prosecutorial immunity under Ohio law. Accordingly, we find that the district court did not err by granting Anderson's motion for summary judgment as to Beckett's state law claims for unlawful imprisonment and bad faith.

**V.**

Finally, we turn to the question of whether the district court appropriately granted summary judgment to Forrester. Beckett brought four separate sets of claims against Forrester: (1) official capacity § 1983 claims based on a failure to train; (2) individual capacity § 1983 claims for malicious prosecution and civil conspiracy; (3) Ohio state law official capacity claims; and (4) Ohio state law

individual capacity claims against Forrester in his individual capacity. The district court held: (1) regarding Beckett's § 1983 claims against Forrester in his official capacity, Beckett had failed to establish that a custom or policy of the City of Toledo played a part in the violation of federal law; (2) with regard to the § 1983 individual capacity claims for malicious prosecution and civil conspiracy, Beckett failed to plead conspiracy with specificity and Forrester was shielded by qualified immunity; and (3) Forrester was protected from official capacity state law claims by state immunity under Ohio's Political Subdivision Tort Liability Act, OHIO REV. CODE § 2477.01. Having disposed of all federal claims, the district court declined to exercise supplemental jurisdiction over Beckett's individual capacity state law claim. Beckett on appeal makes no argument regarding whether Forrester was entitled to state immunity under OHIO REV. CODE § 2477.01, which was the basis of the district court's opinion as to Beckett's official capacity state law claims. We therefore find that Beckett has waived any appeal on this issue, and hence this claim. See *LoCoco*, 530 F.3d at 451("[a]n appellant waives an issue when he fails to present it in his initial briefs."). Neither party has appealed the district court's decision not to exercise supplemental jurisdiction over Beckett's individual capacity state law claim, and so that issue is not before us today. Accordingly, we consider only Beckett's appeal as to the district court's judgment regarding Beckett's official capacity and individual capacity § 1983 claims.

### A. § 1983 Official Capacity Claims

In granting Forrester's motion for summary judgment as to Beckett's § 1983 official capacity claim, the district court held that Beckett had failed to establish that a custom or policy of the City of Toledo played a part in the violation of federal law. Beckett now argues that he "*did submit*

evidence tending to show that both the County and City turned a blind eye to abuses in this case. . . . Williams' affidavit and letter attest to nothing less than a complete derailing of the criminal prosecution process for the unlawful purpose of manufacturing a criminal case against a particular individual." (Beckett Br. at 34.) We now find that the district court correctly determined that Beckett failed to make the showing necessary to demonstrate that any injury suffered resulted from the City's official policy or custom.

"Under § 1983, a municipality can only be held liable if the plaintiff demonstrates that the injury suffered was a direct result of the city's official policy or custom." *Slusher v. Carson*, 540 F.3d 449, 456-57 (6th Cir. 2008) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)). Beckett specifically alleges that Forrester is liable in his official capacity because of a failure to train. The inadequacy of police training only serves as a basis for § 1983 liability, however, "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Id.* (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). In other words, Beckett needs to show prior instances of unconstitutional conduct demonstrating that Toledo has ignored a history of abuse.

Beckett cannot make this required showing. As the district court observed, the only evidence Beckett produced regarding any custom or policy was that presented in the affidavit of Dion Howells, Beckett's investigator. On the basis of the materials included in this affidavit – which

consisted almost entirely of two articles from the *Toledo Blade* regarding the investigation of a 1996 murder, the official criminal records of various individuals, an affidavit from witness Reginald Atkins stating that Forrester had lied about interviewing him, and Howells' own reports regarding what he was told by two attorneys, one of whom thought Forrester was overly aggressive and the other of whom had no information relevant to the case – Howells claimed to have "discovered that the Toledo Police Department made it part of their investigative techniques in murder prosecutions to use perjured testimony in their murder investigations" and that "the City of Toledo uses illegal and unconstitutional tactics in their homicide investigations and prosecutions." (R. 78 Ex. 8 (Howells Affidavit), at 1.) The district court, however, while explicitly refusing to rule on Howells' credibility or qualifications as an expert witness, correctly concluded that, even if all of Howells' information was true, it was not sufficient to create a genuine issue of material fact as to the existence of a custom or policy in Toledo of using perjured testimony to win convictions.

As the district court observed, Howells identified only a single instance in which, according to various hearsay testimony, the Toledo police had relied upon perjured testimony in prosecuting a murder. In that case, moreover, once the witness recanted the prosecutor withdrew charges – and so the city did *not* ultimately use perjured testimony to gain a conviction. This slim evidence was simply not sufficient to show that the city had ignored a history of abuse or was on notice that the training in this area was somehow deficient. Howells's only other relevant evidence is the affidavit from Atkins, who claimed that Forrester had not in fact interviewed Atkins on June 11, 1996, and that Forrester wanted to encourage Atkins to testify falsely against Beckett. As Atkins did not actually testify at either the Grand Jury or at trial, however, it is not clear how Forrester was allegedly

"using" Atkins' "perjured testimony" in pursuing the murder investigation. Moreover, as the district court correctly concluded, "complaints about the alleged unconstitutional arrests and treatment of other persons in connection with Cunningham's murder do not establish a policy or custom of such action by the City." (R. 109 at 9 (citing *Peet v. City of Detroit*, 502 F.3d 557, 558 (6th Cir. 2007)).)

By insisting that his evidence of alleged wrongdoing *in this case* – almost all of which, as we have already explained, constitutes inadmissible hearsay that the district court was required to ignore – demonstrates some sort of policy or custom, Beckett misses the point: he is basing his "policy or custom" argument on a failure to train, and so must show "prior instances of unconstitutional conduct." *Slusher*, 540 F.3d at 456-57. Here, however, he has failed to present *any* evidence regarding the training of the police force, and insufficient evidence suggesting that the City was on notice that there had been similar problems in the past. As a result, he simply cannot create a genuine issue of material fact as to whether a failure to train has resulted in a policy or a custom of encouraging wrongdoing within the municipality. Accordingly, we find that the district court appropriately granted summary judgment to Forrester as to Beckett's § 1983 official capacity claim.

**B. § 1983 Individual Capacity Claims for Malicious Prosecution and Civil Conspiracy**

In granting Forrester's motion for summary judgment as to the § 1983 individual capacity claims for malicious prosecution and civil conspiracy, the district court found both that Beckett failed to plead the conspiracy claim with specificity and that Forrester was, moreover, protected from both claims by qualified immunity. Beckett now argues that in granting Forrester's motion for summary judgment the district court was improperly cloaking Forrester with a prosecutor's absolute immunity, rather than a police officer's qualified immunity, and that regardless Forrester should not

be shielded by qualified immunity because Forrester had attempted to frame Beckett. In fact, while the district court mischaracterized a Supreme Court case governing the application of qualified immunity to prosecutors acting as investigators, the district court did *not* cloak Forrester with absolute prosecutorial immunity. Instead, having correctly found that there was probable cause for Beckett's prosecution, the district court found that there was no constitutional violation, and so found that Forrester was shielded by qualified immunity from Beckett's claims for malicious prosecution and civil conspiracy to commit malicious prosecution.

Beckett argues first that the district court erred by cloaking Forrester, a police officer entitled to qualified immunity, with Anderson's absolute prosecutorial immunity. As evidence of the district court's error, Beckett points to a section of the district court's opinion in which the court analogized its reasoning on Forrester's motion to its earlier reasoning on Anderson's motion:

> Moreover, the portion of Williams' affidavit stating that Forrester and Anderson instructed Williams "what to testify to during the Grand Jury and Jury trial" was addressed in a previous opinion by this Court. (Doc. 109 at 8; Doc. 102 at 12). The Court ruled that "the coercive conduct in question resulted from Defendant Anderson 'acting as an advocate for the state' in that he was 'evaluating evidence, interviewing witnesses and preparing witnesses for trial.'" (Doc. 109 at 8). "When functions of prosecutors and detectives are the same . . . the immunity that protects them [from § 1983 liability] is also the same." *Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993). "[I]t is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" *Id.* (citing *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973)).

(Sept. 28, 2007 District Ct. Order at 13.) In other words – in Beckett's reading – the district court concluded that Anderson was entitled to absolute prosecutorial immunity, and that under *Buckley* Forrester was entitled to the same immunity for the exact same acts.

The district court clearly erred insofar as it read *Buckley* as cloaking a police officer with the same immunity that protects a prosecutor who in the same case engaged in exactly the same conduct. Rather than holding that police officers assisting prosecutors prepare witnesses for trial (and thus engaged in prosecutorial functions) are cloaked by complete prosecutorial immunity, in fact *Buckley* holds that prosecutors engaged in police functions *lose* their absolute prosecutorial immunity, and instead (like police officers) are cloaked in those instances only by qualified immunity. *See Buckley*, 509 U.S. at 276. While the district court misread *Buckley*, however, it is clear that this misreading was irrelevant to the court's primary reasoning, which was that Forrester was in fact shielded by qualified immunity. Put another way, Forrester did not need Anderson's absolute prosecutorial immunity, and so – as the district court's use of the word "moreover" indicates – the district court's reasoning regarding *Buckley* was simply extraneous. (See Sept. 28, 2007 District Ct. Order at 9-13 (discussing the qualified immunity standard and holding that there was probable cause for the investigation and prosecution of Beckett).)

Alternatively, Beckett argues that the district court erred by finding that Forrester was shielded from Beckett's claims by qualified immunity. Qualified immunity recognizes that the public interest is best served when officials can act "with independence and without fear of consequences" so long as their actions do not violate clearly established rights. *Moldowan v. City of Warren*, 578 F.3d 351, 369 (6th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). It protects officers from "undue interference with their duties and from potentially disabling threats of liability." *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005). Qualified immunity is more than a mere defense against the claim, but rather serves the more important role of providing

immunity from suit. *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008) (quoting *Scott*, 550 U.S. 372). In interpreting the Supreme Court's test for qualified immunity as described in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), Sixth Circuit panels vary in using either a two-part or three-part approach. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005). Under the two-part approach, we determine whether: (1) the facts viewed in the light most favorable to the plaintiff show that a constitutional right has been violated; and (2) the violation involved a "clearly established" constitutional right of which a reasonable person would have known. *Id.* at 311 (citing *Saucier*, 533 U.S. at 201); *Sample*, 409 F.3d at 695-96.[6] Courts may address the prongs of the qualified immunity analysis in whatever order is most useful. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (U.S. 2009).

### i. Malicious Prosecution

As the district court notes, Beckett's complaint stated a general claim for violation of due process; in his briefs to the district court, the only due process claim Beckett presented was for malicious prosecution under federal law. In order to maintain a federal malicious prosecution claim, "it is clear that a plaintiff must show, at a minimum, 'that there was no probable cause to justify [his] arrest and prosecution.'" *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003) (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001)). If Beckett cannot show there was no probable cause, then he cannot demonstrate any seizure in violation of the Fourth Amendment.

---

[6]Under the tripartite approach, courts also consider whether "the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Sample*, 409 F.3d at 695-96.

In that case, Beckett's claim automatically fails the first *Saucier* prong, and Forrester is entitled to qualified immunity.

Beckett argues both that the Williams, Eaton, and Atkins affidavits demonstrate that Forrester framed Beckett for the murder (and so there was no probable cause to investigate and prosecute Beckett), and also that the district court in granting his habeas petition already concluded that Beckett's constitutional rights had been violated. As almost all of the statements in the Williams and Eaton affidavits are inadmissible hearsay, however, the only *admissible* evidence Beckett can produce is: (1) Williams' and Eaton's statements that they committed perjury; (2) Atkins' statement that Forrester encouraged Atkins to testify falsely, but that Atkins chose not to; and (3) the district court's habeas decision.[7] On the other side, demonstrating that at the time of the prosecution Forrester in fact had probable cause, is: (1) the undisputed fact that Williams initiated contact with police; (2) Williams' Grand Jury and trial testimony implicating Beckett; (3) Eaton's identification of Beckett as the man she saw the night of the murder; (4) Ouida Gordon's testimony that Cunningham owed money; and (5) Anthony Pierson's testimony that Beckett and Cunningham had been arguing about money.

---

[7]As the district court observed, and is apparent from the briefs and oral argument, Beckett routinely misrepresents the district court's habeas decision and the Sixth Circuit's affirmance of that decision. While the district court did determine that Beckett's constitutional rights had been violated by Anderson's failure to correct Williams' testimony regarding the promises prosecutors and police had made to send letters Williams' parole board, the court did *not* determine that Beckett had been framed, that Beckett's constitutional rights had been violated by a malicious prosecution, or that there was no probable cause for investigating and prosecuting Beckett.

As we have repeatedly observed, "it has been long settled that 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer.'" *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006) (quoting *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)). While an indictment might not be fair upon its face provided a plaintiff could prove that the witnesses testifying before the grand jury had been coerced or coached to lie, in this case Beckett cannot produce admissible evidence demonstrating that Anderson, Forrester, or anyone else influenced those who actually testified at Beckett's grand jury. Beckett thus has not produced evidence demonstrating that Forrester lacked probable cause to investigate and assist in Beckett's prosecution. Even if the indictment by itself were not sufficient to demonstrate that Forrester had probable cause, moreover, the admissible evidence clearly demonstrates that probable cause to prosecute Beckett existed before and during the trial. "The Ohio courts define probable cause for the purposes of a malicious prosecution claim as 'a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious [individual] in the belief that the person accused is guilty of the offense with which he [or she] is charged.'" *Harris v. Bornhorst*, 513 F.3d 503, 520 (6th Cir. 2008) (quoting *Rogers v. Barbera*, 164 N.E.2d 162, 166 (Ohio 1960)).

A police officer is protected by qualified immunity where a plaintiff cannot demonstrate that there has been a constitutional violation. *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005). Accordingly, we find that the district court appropriately granted Forrester's motion for summary judgment as to the § 1983 individual capacity claim for malicious prosecution, as Beckett cannot show that the police lacked probable cause for the investigation and prosecution.

## ii. Civil Conspiracy

Beckett's civil conspiracy claim against Forrester, that he conspired with Ford to maliciously prosecute Beckett, similarly turns on the probable cause determination: if there was probable cause for the investigation and prosecution, then there was no *malicious* prosecution, and necessarily Ford and Forrester cannot have conspired to engage in one. As we have stated, there was certainly probable cause for both the investigation and prosecution of Beckett. Accordingly we find that the district court did not err in granting Forrester's motion for summary judgment as to Beckett's § 1983 individual capacity claim for civil conspiracy.

## V.

This appeal is, at its heart, quite simple, but has been complicated significantly by the ineptitude, confusion, and histrionics of Beckett's counsel. As we indicated in *Beckett v. Haviland*, 76 F. App'x 726 (6th Cir. 2003), Anderson improperly failed to correct Williams' trial testimony; the correct judicial remedy for Anderson's improper behavior was for us to affirm the grant of Beckett's petition for a writ of habeas corpus. That Beckett was entitled to habeas relief because of a prosecutor's failure to correct a witness's testimony, however, does not mean that Beckett is now entitled to recover damages. Beckett's case against Anderson and Forrester is built almost entirely on supposition, hyperbole, and – most importantly – inadmissible evidence. Indeed, the great majority of the statements in the Williams and Eaton affidavits – the crux of Beckett's case – are inadmissible hearsay that courts are required to disregard at the summary judgment stage. Even were these affidavits taken into account, moreover, Anderson was clearly protected by absolute prosecutorial immunity for any wrongdoing alleged by Beckett – *including* failing to correct

Williams' testimony and even allegedly coaching Williams to incriminate Beckett falsely. While the district court in granting summary judgment to Forrester clearly misread *Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993), as cloaking police officers assisting prosecutors with absolute prosecutorial immunity, that misreading is ultimately irrelevant: given that there was probable cause for Beckett's prosecution, Forrester is entitled to the qualified immunity that the district court correctly recognized. Accordingly, we **AFFIRM** the judgment of the district court.