MEMORANDUM OPINION
McKEAGUE, Circuit Judge.
Ford Motor Company (“Ford”) appeals a jury verdict in favor of Dawn and Darrell Maggard. The jury found Ford strictly liable for injuries sustained by Dawn Mag-gard (“Dawn”) after her leg was trapped under her Ford Windstar van as it unexpectedly began to roll backwards out of her driveway. The jury awarded *369 $3,400,000.00 in compensatory damages[1] and $9,000,003.00 in punitive damages.
Ford advances three issues on appeal. First, Ford argues that the district court erroneously excluded statements by Dawn’s then ten-year old daughter, Holly Maggard (“Holly”), regarding the events leading to Dawn’s injury. Second, Ford asserts that the award of punitive damages was unwarranted under Tennessee law because the Maggards did not demonstrate by clear and convincing evidence that Ford acted recklessly. Third, Ford argues that the award of punitive damages violates Ford’s due process rights. For the reasons set forth below, we reverse the district court’s exclusion of Holly’s statements, vacate the jury’s verdict and award of damages, and remand the case for a new trial.
I
This ease arises from events that occurred on the evening of May 24, 2004. Dawn and her two daughters, Holly and Audrey, were preparing to travel from their home to a local store. They left their house and went to the Maggards’ Ford Windstar van. What happened after they approached the Windstar is disputed by the parties; however, both parties agree that the Windstar began rolling backwards. As the Windstar began rolling, Dawn’s leg was trapped underneath one of the Windstar’s tires. Holly and Audrey screamed as they watched the Windstar pull Dawn with it as it rolled down the driveway and came to a stop in the ditch across from the Maggards’ house. Officer James Capps later stated that the accident left “evidence of blood and skin ... on the driveway and the roadway.”
Once the Windstar stopped, Holly and Audrey ran toward Dawn. Holly tried to lift the Windstar off Dawn. Holly then climbed over Dawn, entered the Windstar, placed the gearshift into park, and took the keys out of the ignition. She ran into her home and called 911 on two phones. She put down the phones before the 911 operator answered, leaving the lines open, so that she could rush back to check on her mother. After neighbors came to the scene of the accident, Holly ran to a neighbor’s house, where she and Audrey stayed that night. Emergency personnel responded after Holly had left, and they administered medical care to Dawn. Despite their efforts, Dawn’s leg was later amputated.
How the Ford Windstar began rolling down the driveway, trapping Dawn’s leg and causing Dawn’s injury, is the issue at the center of this lawsuit. There are two competing accounts: one offered by Dawn during her testimony at trial and by Holly during her deposition, the other offered by Holly shortly after the accident in response to questions from a police officer.
According to Dawn’s testimony and Holly’s deposition, the accident occurred as follows. The Windstar was parked in the driveway of the Maggards’ home. Dawn, Holly, and Audrey left their house to get into the Windstar. Dawn entered the Windstar, started the ignition, and backed up the Windstar a few feet to allow her daughters space to walk around to the other side of the Windstar. After backing the Windstar up a short distance, Dawn realized that she needed to return to the house to place the family dog into a kennel. She moved the Windstar’s gearshift lever into the park position, left the engine on, and removed her foot from the brake pedal. She exited the Windstar, and it *370 remained stationary. As Dawn walked toward the house, Holly yelled that the Windstar was moving backward down the sloped driveway. Dawn ran to the driver’s side door and attempted to enter the Windstar. Unable to stop the Windstar and concerned that it might hit Audrey, Dawn attempted to steer the Windstar away from Audrey. As she did that, the Windstar continued to move backwards down the driveway, trapping Dawn’s leg under one of its wheels. Dawn offered this account throughout the litigation, and Holly provided a substantively identical account at her deposition.[2]
The alternate explanation of the accident arose from statements Holly made to the police just after the accident. Officer James Capps responded to the emergency call and arrived at the scene to investigate the accident. When he arrived, Dawn had already been taken away in an ambulance. Officer Capps examined the scene and questioned those present about the accident. After learning that Holly and Audrey were nearby at a neighbor’s house, Officer Capps went to see them. He interviewed Holly approximately thirty to forty minutes after she left the scene of the accident. His report provided as follows:
[T]he witness, the driver’s ten-year-old daughter ... stated her mother was going to drive her and her little sister to Walgreens. Witness stated her mother was getting in the driver’s seat while she and her sister walked around to the passenger side. Witness stated her mother was halfway in the van when she slipped. Witness stated her mother grabbed the gearshift [sic] as she slipped and the van went into reverse. The van was parked at the top of driver’s inclined driveway and began rolling backwards. Witness stated her mother could not keep up to get in and, as she struggled, the van turned and the driver’s leg was pulled under the front and dragged ... and victim fell out of the van and was trapped under the van as it came to rest in the ditch across the street.
According to Officer Capps’s report, Dawn was wearing flip-flops or sandals that became lodged inside of the vehicle while she was entering the Windstar.
At his deposition, Officer Capps provided the following description of Holly’s demeanor at the time that she spoke with him: “I don’t recall her being very upset and having difficulty talking to me, I mean, other than naturally being upset about what had just happened. And I do kind of recall thinking that she probably didn’t really know at the time the seriousness of it.”
On May 9, 2005, the Maggards filed a complaint advancing, inter alia, negligence and strict liability claims against Ford. The complaint also identified the Mag-gards’ minor children, Holly and Audrey, as plaintiffs. The Maggards alleged that the accident occurred because the transmission would occasionally rest on the “land” between reverse and park. The Maggards referred to this as “illusory park.” They contended that illusory park would lead the driver to believe that the gearshift lever was in the park position, though the gearshift lever could still slip *371 into the reverse position, engaging the transmission and allowing the Windstar to roll backwards.
On December 15, 2006, the Maggards filed twelve motions in limine, including a motion to exclude Holly’s statements made to the investigating officer. On December 21, 2006, presumably recognizing that Holly’s statements to the police would be admissible as an admission by a party-opponent under Fed.R.Evid. 801(d)(2), the Maggards requested that Holly and Audrey be voluntarily dismissed as plaintiffs pursuant to Fed.R.CivP. 41(a). The district court dismissed Holly and Audrey on January 2, 2007. At the final pretrial conference, the district court granted the Maggards’ motion in limine and excluded Holly’s statements, concluding that the statements were no longer admissible as an admission by a party-opponent under Fed.R.Evid. 801(d)(2). The district court also ruled that Holly’s statements were not admissible under the excited utterance exception, Fed.R.Evid. 803(2), or present sense impression exception, Fed.R.Evid. 803(1). The district court stated that Ford could ask Holly about the statements, but that Ford could not call Officer Capps to testify regarding the statements.
In the joint pretrial order, Ford advanced the theory that “[Dawn] was injured because she got out of the Windstar, leaving its engine running, and without putting it in Park, without removing the key from the ignition or without setting the parking brake, any one of which alone would have prevented this accident from oecurring.”[3] Ford’s expert witnesses, Frederick W. King, III and Hugh J. Maul-din, Jr. found flaws in both Dawn’s account and in Holly’s statements to Officer Capps. They did both note, however, that the gearshift could be moved into reverse if someone slipped entering the Windstar, so long as the engine was off and the ignition was in “Off” rather than “Lock.”[4] The district court excluded this testimony because there was no evidence in the record that the engine was off.
A jury trial commenced on July 17, 2007. Prior to the jury’s verdict, Ford moved for judgment as a matter of law. Ford articulated a number of errors, including the district court’s exclusion of Holly’s statements. Subsequently, the jury returned a verdict finding the Windstar to be defective and Ford strictly liable for the Mag-gards’ injuries. The district court issued a post-trial memorandum and order denying Ford’s motion for judgment as a matter of law. Ford filed a notice of appeal on December 12, 2007.
II
“[EJvidentiary decisions such as exclusion of hearsay” are generally reviewed under the abuse of discretion standard. United States v. Hadley, 431 F.3d 484, 496 (6th Cir.2005) (citing United States v. Sckreane, 331 F.3d 548, 564 (6th Cir.2003)); see also Schweitzer v. Teamster Local 100, 413 F.3d 533, 538 (6th Cir.2005). “An abuse of discretion will be found upon a ‘definite and firm conviction that the *372 court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.’ ” Schreane, 331 F.3d at 564 (quoting Super Sulky, Inc. v. United States Trotting Ass’n, 174 F.3d 733, 740 (6th Cir.1999)).
The district court excluded Holly’s statements because it found that the statements were hearsay and that they did not fall within either the excited utterance or present sense impression exception to the hearsay rule. Ford contends that the district court conflated the exception for excited utterances with that of the exception for present sense impressions and that the statements were admissible as excited utterances. We find that the district court did not conflate the two exceptions. The factors for analyzing whether a statement is within the present sense impression exception and whether it is within the excited utterance exception are similar, and the district court appropriately considered both exceptions in assessing Holly’s statements.
We also agree with the district court that Holly’s statements did not fall under the present sense impression exception. Our analysis therefore turns on whether the district court abused its discretion in finding Holly’s statements were not excited utterances. An excited utterance is “[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” Fed.R.Evid. 803(2). 'An excited utterance is considered trustworthy because “circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.” Fed.R.Evid. 803 advisory committee’s notes (citation omitted). A hearsay statement is admissible under the excited utterance exception if “(1) there [is] an event startling enough to cause nervous excitement; (2) the statement [is] made before there is an opportunity to contrive or misrepresent; and (3) the statement [is] made while the person [is] under the stress of the excitement caused by the event.” United States v. Beverly, 369 F.3d 516, 539-40 (6th Cir.2004) (citing Haggins v. Warden, Fort Pillow State Farm, 715 F.2d 1050, 1057 (6th Cir.1983)).
Courts consider these elements on “a case-by-case basis.” Haggins, 715 F.2d at 1057. “All three inquiries bear on ‘the ultimate question’: ‘Whether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event.’ ” United States v. Arnold, 486 F.3d 177, 184 (6th Cir.2007) (quoting Haggins, 715 F.2d at 1058). Put another way, the exception requires that “the speaker be ‘under the sway of a ‘startling event’ and that the statement be made before there is an opportunity ‘to contrive or misrepresent.’ ” United States v. Winters, 33 F.3d 720, 723 (6th Cir.1994) (quoting Haggins, 715 F.2d at 1057). “The assumption underlying [the] exception is that a person under the sway of excitement precipitated by an external startling event will be bereft of the reflective capacity essential for fabrication and that, consequently, any utterance he makes will be spontaneous and trustworthy.” Haggins, 715 F.2d at 1057.
There is no dispute regarding the first element in the excited utterance analysis. Holly witnessed a serious accident that caused her mother significant harm. The last image she had of her mother before she left was her mother trapped under the family van in a ditch across the road from their home. It is abundantly clear from the record that the accident was sufficiently startling to cause nervous excitement, particularly in a 10-year-old girl involved in an accident with her mother, and there *373 fore satisfied the first element. See Beverly, 869 F.3d at 539-40.
The district court did not appear to give serious consideration to the second element. The district court simply noted that thirty or forty minutes had passed between the accident and Holly’s statements, without addressing whether the passage of time did or did not give Holly the opportunity to fabricate or misrepresent. The period between the startling event and the statement is relevant to determining whether the statement was made before an opportunity to contrive or misrepresent arose.[5] See Arnold, 486 F.3d at 185. The excited utterance exception, however, does not contain an explicit time limitation. Compare Fed.R.Evid. 803(1) and 803(2). Indeed, the opportunity to fabricate or misrepresent cannot be reduced to the simple passage of time. We have held that the excited utterance exception permits the admission of a statement made hours after the startling event. See, e.g., United States v. Baggett, 251 F.3d 1087, 1090 n. 1 (6th Cir.2001) (finding statements made several hours after startling event were excited utterances); see also United States v. McCullough, 150 Fed.Appx. 507, 510 (6th Cir.2005) (applying exception to statement made approximately two-and-a-half hours after startling event); United States v. Green, 125 Fed.Appx. 659, 662 (6th Cir.2005) (finding statement made three hours after startling event to be admissible as excited utterance in spousal assault because “trauma and anxiety ... do not suddenly dissipate when the assailant leaves the scene”); United States v. Tobaja, 91 Fed.Appx. 405, 410 (6th Cir.2004) (holding that a statement made up to eleven hours after the startling event was an excited utterance). A court should therefore focus on whether the declarant had the opportunity to fabricate or misrepresent in light of the circumstances of the event. See Fed.R.Evid. 803(2) advisory committee’s note (“[T]he character of the transaction or event will largely determine the significance of the time factor.”) (quoting M.C. Slough, Spontaneous Statements and State of Mind, 46 Iowa L.Rev. 224, 243 (1961)).
There is no basis in this record upon which the district court could conclude that Holly had an opportunity to fabricate. See Kenneth S. Broun, George E. Dix, et al„ Mccormick on Evidence § 272 n. 30 (5th ed.2006) (collecting cases in which courts found no opportunity to fabricate). Simply noting thirty to forty minutes had elapsed between the accident and the time of her interview by Officer Capps was insufficient. Holly had just seen her mother seriously injured. She had attempted to lift the Windstar off her mother. She had to climb over her mother to put the Winds-tar in park. Immediately after dialing 911, she ran back to check on her mother — without even speaking to the 911 operator. After neighbors arrived, she ran to a friend’s house where, thirty to forty minutes later, she spoke with Officer Capps. There is simply no reason to believe that she would have recovered from that experience in the short time between the accident and her statements to Officer Capps. There is also absolutely no evidence in the record that anyone counseled her about how she should describe the accident or even that she discussed the accident in any detail with anyone, including her father who, it appears, had yet to arrive at the neighbor’s house. Additionally, the substance of her statements indicated that she thought that her mother was responsible *374 for the accident. See Gross v. Greer, 773 F.2d 116, 120 (7th Cir.1985) (“There is no reason to believe her statement to the officer was made with any premeditation, design or reflection.”). It is highly improbable that, given the opportunity to fabricate or misrepresent, Holly would seize the opportunity to concoct a statement that indicated that she thought that her mother was at fault as opposed to a statement attempting to protect her mother.
The district court also failed to fully analyze the third element. The third element asks whether the declarant made the statement under the stress of the excitement caused by the event. Beverly, 369 F.3d at 539-40. Relevant factors in determining whether a speaker remains under the stress of the excitement include “(1) the lapse of time between the event and the declarations; (2) the age of the declar-ant; (3) the physical and mental state of the declarant; (4) the characteristics of the event; and (5) the subject matter of the statements.” United States v. Jennings, 496 F.3d 344, 349 (4th Cir.2007) (quoting Morgan v. Foretich, 846 F.2d 941, 947 (4th Cir.1988)); see also Haggins, 715 F.2d at 1058 (stating that factors such as age, physical condition, and mental condition affect the determination whether a declar-ant remains under the stress of the event); United States v. Iron Shell, 633 F.2d 77, 85-86 (8th Cir.1980). Rather than considering these factors, the district court simply concluded that Holly “was calm.” An examination of these factors, however, indicates that, whether or not the district court is correct to conclude from Officer Capps’s description of Holly’s demeanor that she “was calm,” Holly appears to have clearly been under the influence of the stress of the excitement of the accident when she made her statement to Officer Capps.
A review of the record as a whole strongly indicates that Holly was still under the stress of the excitement of the accident. See Tabaja, 91 Fed.Appx. at 410 (finding that the nature of the startling event justified applying excited utterance exception to a statement made up to eleven hours after the event). Holly witnessed her mother pulled underneath the Winds-tar and dragged down the driveway and across the street. According to her mother, Holly was screaming as the accident occurred. The accident left blood and skin on the driveway, and Holly heard her mother yelling as Holly climbed over her to turn off the Windstar. The inference that Holly was affected by the accident is further supported by the fact that she did not even wait to speak to the 911 operator before running back to check on her mother. Additionally, Holly left the scene of the accident before learning whether her mother was safe. There is no suggestion that she had been comforted by her neighbors, told that her mother would be fine, told that her mother was not in any danger, or been comforted by her father who, it appears, had yet to arrive. In fact, Officer Capps concluded that Holly was still “naturally upset” when he spoke with her. The nature of the event itself therefore strongly supports a finding that Holly would have remained under the stress of the excitement of the event for a significant period of time.
The district court also does not appear to have considered Holly’s age in assessing whether Holly was still under the stress of the excitement of the event. Holly was ten years old at the time of the statements and had just witnessed her own mother dragged down their driveway by the Windstar. Witnessing such an accident involving a parent would presumably affect a child regardless of age, but it seems to us indisputable that a ten-year-old child would be more profoundly affected than *375 someone older and better equipped to deal with seeing a parent incapacitated and in great pain.[6] Accordingly, Holly’s age also indicates that she was under the stress of the excitement of the event when she spoke to Officer Capps.
The remaining factors also indicate that Holly remained under the stress of the accident The subject matter of Holly’s statements was the accident that injured her mother. When the subject matter of the statement involves the startling event itself, the subject matter supports a finding that the declarant was still under the stress of the accident. See United States v. Alexander, 331 F.3d 116, 123 (D.C.Cir.2003) (quoted in Arnold, 486 F.3d at 186). Similarly, though some time elapsed between the accident and Holly’s statements, it was clearly not enough time to take Holly outside the influence of the stress of witnessing the accident.
Finally, contrary to the district court’s assessment of Holly’s physical condition and state of mind, we find that Holly’s physical condition and state of mind also indicate that she was under the stress of the excitement of the accident when she spoke with Officer Capps. While the district court concluded that Holly “was calm,” it based its conclusion on a quote from Officer Capps’s deposition taken out of context. In response to a question regarding Holly’s demeanor, Officer Capps stated, “I don’t recall her being very upset and having difficulty talking to me, I mean, other than naturally being upset about what had just happened. And I do recall thinking that she probably didn’t really know at the time the seriousness of it.” Nowhere in his deposition does Officer Capps describe Holly as “calm.” In fact, Officer Capps clearly stated that Holly was “naturally upset about what happened.”[7]
Additionally, even if Holly had not manifested any outward indications of her state of mind, it is simply implausible that a ten-year old in this situation would be calm. When a child witnesses her parent suffer a serious injury and then displays no outward emotion, shock — not calm — would be the best assessment of her state of mind. And a statement made while in shock is an excited utterance. See Hoggins 715 F.2d at 1058; United States v. Sewell, 90 F.3d 326, 327 (8th Cir.1996) (“The justification for the ‘excited utterance’ exception ... derives from the teaching of experience that the stress of nervous excitement or physical shock ‘stills the reflective faculties.’ ”) (quoting United States v. Elem, 845 F.2d 170, 174 (8th Cir.1988)).
In conclusion, every possible factor in assessing the third element of the excited utterance exception to the hearsay rule about which the record provides informa *376 tion indicates that Holly was under the stress of the accident.[8] The district court either did not consider the relevant factors or did not apply them correctly to the case at hand. Its failure to correctly assess whether Holly remained under the stress of the excitement of the accident, paired with the clearly startling event and the lack of an opportunity for Holly to fabricate or misrepresent, gives us the firm conviction that the district court erred in its judgment that Holly’s statements were not excited utterances. We are loath to reverse the district court on this issue,[9] but we cannot escape our firm conviction that the district court erred.
We find that the record compels the conclusion that the accident was a startling event, that thirty to forty minutes did not provide a ten-year-old girl who had just watched her mother seriously injured the opportunity to contrive or misrepresent, and that Holly was still under the stress of the startling event when she made her statements to Officer Capps.
We further find that the district court’s error was not harmless. “The harmless-error standard provides that if ‘one cannot say, with fair assurance, ... that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.’ ” Mike’s Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 409-410 (6th Cir.2006) (quoting DePew v. Anderson, 311 F.3d 742, 751 (6th Cir.2002)). The district court’s error in this case limited the jury to only one plausible version of the events leading to Dawn’s injury. It is impossible to say how the jury would have acted if there had been an alternate explanation of the events leading to Dawn’s injury rather than only the version put forward by Dawn and Holly at trial. See Nemir v. Mitsubishi Motors Corp., 381 F.3d 540, 558-60 (6th Cir.2004) (exclusion of evidence of alternate narrative was not harmless error); see also Hilyer v. Howat Concrete Co., Inc., 578 F.2d 422, 424 (D.C.Cir.1978).[10] *377 Additionally, Holly’s statements regarding the accident were made immediately after the accident and are the most contemporaneous account of the accident available. They are thus powerful evidence of what in fact happened. Accordingly, the exclusion was not harmless error.[11]
Ill
The district court abused its discretion in excluding Holly’s statements. Given the potential importance of an alternate explanation for the events leading to Dawn’s injury, it cannot be said with fair assurance that the exclusion of Holly’s statements did not affect the outcome of the trial. Thus, we REVERSE the district court’s exclusion of Holly’s statements as inadmissible hearsay and REMAND for the district court to grant a new trial.

. The district court reduced the amount of compensatory damages to $2,720,000.00 in light of the jury’s finding that Dawn was twenty percent at fault.

. At her deposition, Holly stated that her mother started the Windstar and then went to the house to put the dog in the kennel. Holly further stated that she had yelled to her mother that the Windstar was rolling backward and that her mother had run back to the Windstar and had tried to jump in and turn the Windstar away from Audrey. Holly acknowledged, however, that she provided a different account of the accident to Officer Capps, though she could not remember what it was. At trial, Holly stated that she could not see anything that happened as her mother entered the van.

. Subsequent to the jury's verdict, Ford moved to amend the joint pretrial order pursuant to Federal Rule of Civil Procedure 16(e) by omitting the phrase “leaving its engine running, and without putting it in Park.” The district court denied the motion.

. The dissent notes that one of Ford's experts suggested that Holly’s statements to Officer Capps were “not consistent with the operational characteristics of a 1999 Ford Windstar van.” The dissent fails to note, however, that the expert continued on to note that the description of the accident in Holly’s statements to Officer Capps were consistent with the operational characteristics of a Ford Windstar if the engine was off at the time of the accident.

. As will be discussed below, the time between the startling event and the statement can also affect the assessment of whether the declarant was still under the stress of the excitement of the event.

. The dissent suggests that Holly may not have fully grasped the severity of her mother’s injury. Though Holly may not have known her mother's life was in danger, there simply can be no argument that she was unaware her mother was injured and in a great amount of pain. A ten-year-old child aware her mother had been hurt in such a serious accident would still be under the stress of the excitement of the accident a half-hour later regardless of whether she knew that her mother's life was in danger.

. The dissent argues that there was a reasonable basis in the record to support the district court’s conclusion that Holly was calm. We disagree. Officer Capps’s answer is not a model of clarity, but it unambiguously indicates that Holly was upset. While it is possible the district court relied on the beginning of Officer Capps's statement, "I don't recall her being very upset,” that was not the entirety of his statement, much less the entirety of the record. Officer Capps noted Holly was naturally upset, and the natural level of distress at witnessing a parent seriously injured is unquestionably high. The district court thus clearly misconstrued the record in finding that Holly "was calm” at the time she spoke with Officer Capps.

. The district court also referred to the fact that Holly's statements were made in response to questioning. Statements made in response to questioning are still excited utterances. United States v. Joy, 192 F.3d 761, 767 (7th Cir.1999); United States v. Glenn, 473 F.2d 191, 194 (D.C.Cir.1972). Further, Officer Capps testified that Holly “came right out and told me everything. I didn't have to pry information out of her or anything.” This strongly suggests that any questioning by Officer Capps did not affect the spontaneity of Holly's statements.

. If the district court had heard live testimony regarding Holly's condition at the time of her statement to Officer Capps, we would be even more hesitant to reverse the district court's decision. However, that was not the case here. The district court excluded Officer Capps’s testimony through a pretrial motion in limine, and it relied solely on the record as developed through discovery.

. The dissent suggests that even if excluding Holly's statements was error, the exclusion may not have affected Ford's substantial rights. In particular, the dissent suggests that the impact of Holly's statements would have been lessened by Holly's age and inexperience as a driver. We cannot agree. First, the dissent overlooks the probative weight Holly’s statements would have as the most contemporaneous account of the accident. Second, the dissent engages in its own "highly debatable conjecture” by suggesting that arguments regarding the weight given to Holly's statements would have substantially diminished the effect of admitting Holly’s statements. Based on the evidence at trial, the jury could find either that the gearshift slipped from "illusory park” into reverse after Dawn left the Windstar or that Dawn exited the Winds-tar while the Windstar was still in reverse. It is no surprise that, faced with this choice, the jury found the Maggards’ theory more likely. Holly's statements, however, provide another explanation for the accident, which was that Dawn slipped upon entering the vehicle and pulled the gearshift from Park into Reverse. It is not conjectural to find that a jury may alter its judgment if provided another plausible account of the event at the center of the *377 dispute. Certainly, we cannot say with fair assurance that the exclusion of Holly’s statements did not affect the judgment.

. The error in excluding Holly’s statements was further compounded by the district court's error in barring its admission even for impeachment purposes. The district court conceded in its order on Ford's motion for judgment as a matter of law that Officer Capps should have been allowed to testify to impeach Holly.