RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 22-3587

STERLING H. ROBERTS,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:18-cr-00032-1—Thomas M. Rose, District Judge.

Argued: July 25, 2023

Decided and Filed: October 17, 2023

Before: MOORE, GIBBONS, and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Kevin Koller, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Kevin Koller, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

───────────────

## OPINION

───────────────

JOHN K. BUSH, Circuit Judge. Sterling Roberts appeals his conviction for federal crimes relating to the death of Robert "Bob" Caldwell. Mr. Caldwell was in a child-custody dispute with his ex-wife, Tawnney Caldwell, who was Roberts' girlfriend. Roberts tried to kill, or at least seriously harm, Mr. Caldwell by luring him through false guise to a remote location.

Mr. Caldwell managed to escape.  Later, he wasn't so fortunate.  Mr. Caldwell was murdered after a family-counseling session.

Roberts argues, based on the Confrontation Clause, federal evidentiary rules, and the attorney-client privilege, that the district court improperly admitted evidence related to the earlier attack and other incriminating proof.  He also raises two constitutional challenges to the interstate stalking statute under which he was convicted, 18 U.S.C. § 2261A, claiming that it exceeded congressional power under the Commerce Clause and that the counts of his conviction are multiplicitous.  Because none of Roberts' arguments have merit, we AFFIRM the district court's judgment of conviction.

**I.**

Because of the numerous relevant persons in this opinion that have the same last name and the various relationships between those persons, we begin with this table listing their names, how they are referenced herein, and their relationship to the victim:

| Name | Referenced Name & Relationship to the Victim |
|---|---|
| Sterling Roberts | Roberts<br>(Alleged Perpetrator) |
| Robert Caldwell | Mr. Caldwell<br>(Victim/Decedent) |
| Tawnney Caldwell | Ms. Caldwell<br>(Roberts' girlfriend & Mr. Caldwell's ex-wife) |
| Candice Caldwell | Candice Caldwell<br>(Mr. Caldwell's wife at the time of the murder) |
| Lori Cicero | Cicero<br>(Mr. Caldwell's attorney) |
| James Harmon | Harmon<br>(Tawnney Caldwell's stepfather<br>and victim's previous father-in-law) |

Surveillance cameras captured the murder of Mr. Caldwell on August 15, 2017. At about 4:00 p.m. that day, he arrived with two of his sons at their therapist's office for counseling. Around fifteen minutes later, his then-current wife, Candice Caldwell, dropped off his third son for the session. About forty-five minutes after that, at around 5:00 p.m., someone who looks like Roberts entered the camera's view wearing a hat, a long-sleeved striped shirt, athletic shorts, and gray shoes with a Nike Jumpman logo on them. A few minutes later, the individual was no longer visible in the video. But approximately twenty minutes into the footage, a person who looked like Roberts appeared in the footage. That person sat waiting near the front door of the therapist's office building until around 6:00 p.m., when Caldwell and his sons emerged from the building. At that point the person snuck up from behind Mr. Caldwell and shot him fourteen times before fleeing the scene.

Following this incident, Roberts was arrested. He admitted in an interview that he had gone to the therapist's office building on the day of the shooting. He also identified himself as the individual initially seen lurking in the beginning of the video. Moreover, Roberts' counsel made the same concession during the defense's closing statement. But at trial, his counsel claimed that "another man dressed virtually in the same clothing appears" later in the video and that this other unidentified individual, not Roberts, attacked Mr. Caldwell.

Roberts' defense, however, had to surmount other evidentiary obstacles. Besides the surveillance footage, there was cell phone location data that the prosecution introduced as evidence. This data revealed that a cell phone, bought by Tawnney Caldwell only hours before the attack, was located near the therapist's office building at around the time of the attack. Indeed, only a few minutes before the shooting, that cell phone received a call from another cell phone owned by Ms. Caldwell. And just after the shooting, there was another call between those cell phones, this time originating from the one at the murder scene. Soon thereafter, the location of that cell phone moved away from the therapist's building, indicating southward travel towards Cincinnati and northern Kentucky. During this movement, the cell phone linked to the therapy location was the origin of seven calls to Ms. Caldwell's other cell phone and ten calls to one of Roberts' brothers.

After evening fell, Roberts arrived at the home of James Harmon, who was Ms. Caldwell's stepfather.  Roberts stayed for only around thirty minutes, telling Harmon that he was in a rush.  According to Harmon, Roberts left behind a bag of clothing, including a long-sleeved striped shirt, a pair of shorts or pants, and maybe a hat, which Harmon burned that night.

A few days later, law enforcement caught up with Roberts in Spartanburg, South Carolina.  There, at a gas station, Roberts—in a pair of gray Nike shoes with a Jumpman logo on them—shot at deputies using an AK-47.  Eventually he was subdued and arrested.

This was not Roberts' first arrest.  In April 2017, a few months before Mr. Caldwell's death, his attorney Lori Cicero filed an emergency motion to transfer primary custody of the Caldwells' children from Ms. Caldwell to Mr. Caldwell.  That emergency motion was filed because Roberts had been arrested for illegally possessing a firearm and Mr. Caldwell knew Roberts was often around the kids, in violation of standing court orders.  After a hearing in June, Mr. Caldwell received primary custody.  The court also issued a preliminary order restricting Roberts, who then lived with Ms. Caldwell, from having contact with her three children.  Relevant to this appeal, Roberts was incarcerated before the custody hearing, and he talked about the impending hearing with his girlfriend on a recorded line.  As part of those conversations, Roberts mentioned at least twice the possibility of helping Ms. Caldwell by killing her ex-husband.

In July 2017, after Mr. Caldwell was awarded primary custody, Ms. Caldwell bought a gray Mitsubishi Eclipse convertible, which Roberts drove to Xenia, Ohio to buy a Taurus handgun.  Those purchases are linked to disturbing events that occurred the next month in Jamestown, Ohio.

To recount, in August, Mr. Caldwell received texts from a "Debbie Brown" (just a couple of weeks before his murder) asking him to perform construction work.  Mr. Caldwell was en route to the address that "Brown" had provided him in Jamestown, Ohio when "Brown" texted him a new address for their meeting.  Mr. Caldwell became suspicious, so he asked "Brown" to call him, but "Brown" refused to do so.  Mr. Caldwell then went to the second address, where he parked at the end of the driveway and texted "Brown" to meet him by the mailbox on the street.

Instead of "Brown" appearing, however, Roberts drove up in his girlfriend's new convertible and said: "What's up Bobby? You ready to die?" After hearing those taunts and seeing Roberts exit his car with a gun, Mr. Caldwell fled in his car. Roberts followed in pursuit.

During his escape, Mr. Caldwell called 911 to report that he was being chased by Roberts. Mr. Caldwell told the operator that he was "a little shooken [sic] up" and that he planned to call his wife to "get my kids out of my house." He then called his then-current wife, Candice Caldwell, who described her husband as "fearful," "not calm," and speaking much faster than normal. Mr. Caldwell also called his attorney, Lori Cicero, to relay what had just happened. According to Cicero, her client was "scared, frantic," and "out of breath" during the call. During trial, Roberts objected to Cicero's testimony. But the district court overruled the objection, holding that Mr. Caldwell's statements were excited utterances.

After speaking with the 911 operator, his wife, and his attorney, Mr. Caldwell arrived at the police station, where he completed a three-page handwritten statement detailing the events and identifying Roberts. Several days later, Mr. Caldwell also signed an affidavit attesting that the investigation into those events was ongoing and that he was cooperating with law enforcement.

In the federal criminal trial below, the government moved to admit the written statement and affidavit as evidence of the Jamestown incident. Roberts objected, claiming that their admission violated the Confrontation Clause. The government responded by arguing that the forfeiture-by-wrongdoing exception to the Confrontation Clause applied. The government maintained that Roberts was motivated, at least in part, to kill Mr. Caldwell to keep him from testifying in the custody dispute, and that Roberts knew Mr. Caldwell was cooperating with the investigations into the Jamestown incident. The district court agreed, finding by a preponderance of the evidence that Roberts intentionally caused the decedent's unavailability.

Other proof against Roberts that the district court admitted in evidence, despite his objections, included testimony regarding conversations he had with Mr. Caldwell and Cicero. The day after the encounter in Jamestown, Roberts asked Mr. Caldwell to call him because he had something important to discuss related to the custody dispute. Mr. Caldwell, who recorded

the conversation, confronted Roberts about the incident in Jamestown.  Roberts responded by saying he wanted to speak with Mr. Caldwell's attorney, Cicero, about the custody dispute.  Mr. Caldwell then asked Cicero to call Roberts, and she did.

Cicero understood Roberts to be reaching out with information that might help Mr. Caldwell.  Roberts told Cicero that Ms. Caldwell blamed him for losing custody of her children.  He also admitted that he had threatened Mr. Caldwell in Jamestown but insisted that he had only planned to fight his girlfriend's ex, not kill him.  According to Cicero, she told Roberts during this conversation that she represented Mr. Caldwell, not Roberts.  Moreover, Roberts led Cicero to believe that he did not want their conversation to remain confidential; he asked her to record the call.  And Cicero testified that Roberts did not attempt to seek legal advice.  When Roberts asked if he should turn himself in to the police, Cicero "told him to call Henke, his attorney, and to go to the police" and that she "did not represent him and [] could not help him."

The statements Roberts made to Cicero came into evidence over Roberts' objection that they were protected by attorney-client privilege.  The district court determined that, even though Cicero had been Roberts' court-appointed counsel for separate criminal charges in 2006 and 2008, those representations were discrete appointments and that no ongoing attorney-client relationship existed.

Roberts' defense also was challenged by proof related to incriminating statements he had made to his relatives.  After the Jamestown incident but before the murder, Roberts and Ms. Caldwell traveled from Dayton, Ohio to Nashville, Tennessee.  While on this trip they visited Harmon, Ms. Caldwell's stepfather, in northern Kentucky.  Roberts told Harmon that he had intended to shoot Mr. Caldwell during the Jamestown incident.  After making this admission, Roberts traveled with Ms. Caldwell and Harmon to Roberts' brother's home in Dayton, Ohio, where Roberts made another shocking statement: he asked for a gun because he intended to "smoke" Caldwell.  And on the morning of August 15, 2017, the day of Mr. Caldwell's murder, Roberts and his girlfriend traveled from Harmon's home in northern Kentucky to Ohio.  There, Ms. Caldwell purchased the cellphone that would be located near the therapist's building at the time of the murder later that day.

Finally, relating back to the video footage that was captured outside of Mr. Caldwell's therapist's office, the government introduced testimony from David Loomis, a forensic audio-video analyst in the Ohio Attorney General's Office.  Loomis prepared a three-minute timeline video based on his review of the security camera footage.  Additionally, the analyst took seven still images from the footage and applied minor filters to the images to sharpen and brighten them before enlarging certain regions in the images by 300%.  Loomis testified that these enhancements had not altered the substance of the images.  Roberts objected to the use of the video timeline and still images, claiming they were not accurate, authentic, or trustworthy.  The district court overruled Roberts' objection.

A jury convicted Roberts of two counts of interstate stalking and one count of illegal firearm possession.[1]  Roberts' stalking conviction under 18 U.S.C. § 2261A(2) stems from the Jamestown incident, and his stalking conviction under 18 U.S.C. § 2261A(1) arose from the murder of Mr. Caldwell.  The district court sentenced Roberts to life imprisonment on the stalking counts and ten years' imprisonment for illegal firearm possession.

## II.

Generally, this court reviews a "district court's evidentiary decisions for an abuse of discretion," but "[t]o the extent the evidentiary decision turned on a 'conclusion of law,' we review it de novo." *United States v. Matthews*, 31 F.4th 436, 452 (6th Cir. 2022) (quoting *United States v. Baker*, 458 F.3d 513, 516 (6th Cir. 2006)).  Because of the variety of evidentiary challenges, we discuss the applicable standard of review in each of the sections that follow.

As for Roberts' constitutional challenges regarding 18 U.S.C. §2261A and multiplicitous counts, he did not raise these objections to the district court.  Therefore, we review those issues only for plain error.  *United States v. Al-Maliki*, 787 F.3d 784, 791 (6th Cir. 2015); *United States v. Ehle*, 640 F.3d 689, 694 (6th Cir. 2015).

---

[1]Roberts does not challenge his firearm possession conviction on appeal.

**III.**

**A. Testimonial Statements by the Victim**

Alleged violations of the Confrontation Clause are reviewed de novo. *United States v. Robinson*, 389 F.3d 582, 592 (6th Cir. 2004); *see also United States v. Park*, 278 F. App'x 527, 534 (6th Cir. 2008). The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403 (1965). That provision "bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " *Davis v. Washington*, 547 U.S. 813, 821 (2006) (quoting *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)). Testimonial statements include a declarant's out-of-court statements, such as Mr. Caldwell's written statement and affidavit. *Giles v. California*, 554 U.S. 353, 358, 365 (2008).

There are exceptions, however, that allow testimonial statements into evidence. Relevant here is the forfeiture-by-wrongdoing exception. Fed. R. Evid. 804(b)(6). This exception allows for admission of "[a] statement offered against a party that wrongfully caused . . . the declarant's unavailability as a witness, and did so intending that result." *Id.* Mr. Caldwell was the declarant of the written-witness statement as well as the affidavit, which were to be used against Roberts. And Roberts intentionally caused Mr. Caldwell's unavailability as a witness. These facts fit into the exception, which applies "only when the defendant engaged in conduct designed to prevent the witness from testifying." *Giles*, 554 U.S. at 359.

The government bears the burden of proving by a preponderance of the evidence that Roberts caused Mr. Caldwell's unavailability with the purpose to prevent him from testifying. *Beckett v. Ford*, 384 F. App'x 435, 448 (6th Cir. 2010) (quoting *Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir. 1982)). Roberts concedes that he wrongfully caused Mr. Caldwell's unavailability but claims that there was no proof that he did so to prevent the decedent from testifying. The government met its burden to prove otherwise. Roberts sought to make Mr. Caldwell unavailable to keep him from testifying about the Jamestown incident—the conduct underlying

Roberts' first count in this case. Roberts knew that Mr. Caldwell had identified him fromthe Jamestown incident, had reported Roberts to the police, and had cooperated with the resulting law enforcement investigation. Based on this, it was also reasonably foreseeable to him that the criminal investigation would lead to charges.

Roberts' attitude hardened after the Jamestown incident to ensure Mr. Caldwell's unavailability. Before that encounter, Roberts stated that he "wouldn't kill [Mr. Caldwell] in front of his kids. I'm not that big of a monster." Trial Tr., R. 438, PageID 5169. But Roberts became that monster when he decided to stalk and kill Mr. Caldwell in front of his children after learning of Mr. Caldwell's willingness to cooperate with an investigation into the Jamestown affair. Moreover, Mr. Caldwell was killed within days of the Jamestown incident.

This circumstantial evidence demonstrates by a preponderance of the evidence that Roberts killed Mr. Caldwell, at least in part, to prevent Mr. Caldwell from testifying against him. True, Roberts may have had other reasons for his odious conduct. But even if Roberts had multiple motives to make Mr. Caldwell unavailable, Roberts' desire, at least in part, to prevent Mr. Caldwell from testifying about the Jamestown incident is enough for the exception to apply and to admit the decedent's statements. *See, e.g.*, *United States v. Jackson*, 706 F.3d 264, 269–70 (4th Cir. 2013); *United States v. Martinez*, 476 F.3d 961, 966–67 (D.C. Cir. 2007); *United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir. 1996).

Whether a mixed motive allows for the application of the forfeiture-by-wrongdoing exception is a matter of first impression for our court in this case. That said, no circuit has held that having multiple motives for preventing someone from testifying precludes application of the forfeiture-by-wrongdoing exception. And for good reason. As the Court explained in *Giles*, the foundational principle of the exception is that "no one should be permitted to take advantage of his wrong." *Giles*, 554 U.S. at 366 (citing *Reynolds v. United States*, 98 U.S. 145, 159 (1879)). And that sentiment aligns with the Court's statement in *Crawford v. Washington*, 541 U.S. 36 (2004), that "the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds." *Id.* at 62.

Allowing defendants to avoid this exception because of multiple evil motives would undercut the equitable nature of the exception in the first place.  As the Fourth Circuit noted, "federal courts have broadly construed the elements of the forfeiture-by-wrongdoing exception" to "prevent 'abhorrent behavior which strikes at the heart of the system of justice itself.'" *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012) (quoting Fed. R. Evid. 804(b)(6) advisory committee's note).  And here, we construe Roberts' intent to include the prevention of Mr. Caldwell's testimony, even if Roberts had other motives, because doing so precludes Roberts from "tak[ing] advantage of his wrong[s]." *Giles*, 554 U.S. at 365.

## B.  Non-Testimonial Statements by the Victim

Unlike testimonial statements, the admission of non-testimonial statements is reviewed for abuse of discretion and "merit[s] reversal only if the error is not harmless." *United States v. Farrad*, 895 F.3d 859, 875 (6th Cir. 2018) (citing *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011)); *see also United States v. Trevino*, 7 F.4th 414, 423 (6th Cir. 2021).  Without a contemporaneous objection at trial, the admission of that evidence is reviewed for plain error. *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 776 (6th Cir. 2020) (citing *United States v. Hynes*, 467 F.3d 951, 957–58 (6th Cir. 2006)).

For the first time on appeal, Roberts challenges the admissibility of statements Mr. Caldwell made to his wife and Cicero following the call he made to the 911 operator regarding the Jamestown incident.  Those statements fall within the excited utterance exception to the rule against hearsay.  Fed. R. Evid. 803(2).  Under that exception, a court may admit any "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." *Id.*

The excited utterance exception applies to a statement regarding an event when (1) the event was "startling enough to cause nervous excitement"; (2) the statement was "made before there is time to contrive or misrepresent"; and (3) the statement was "made while the person is under the stress of the excitement caused by the event." *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983).  Put another way, a statement is inadmissible if it resulted from reflective thought, but it should be admitted if it was a spontaneous reaction to an

exciting event. *United States v. Arnold*, 486 F.3d 177, 184 (6th Cir. 2007); *see also Biegas v. Quickway Carriers Inc.*, 573 F.3d 365, 380 (6th Cir. 2009) (setting forth relevant factors).

Roberts does not seem to dispute that his confrontation, threat, and pursuit of Mr. Caldwell in Jamestown was a startling event that caused nervous excitement. Rather, he argues that Mr. Caldwell had enough time during his flight to reflect before speaking to his wife and Cicero such that he was no longer in an excited state. We are not persuaded by Roberts' argument.

Mr. Caldwell's actions did not undo the excited state that Roberts caused. Indeed, a person can remain in an excited state well after being victimized by a crime. *United States v. Overton*, 600 F. App'x 303, 307–08 (6th Cir. 2014) (holding that the victim's statement was an excited utterance even after the victim had the time and intuition to flee and get picked up by his friend following a threat of physical violence by the defendant).[2]

In particular, as to the statements made to his wife, Mr. Caldwell called her right after ending the 911 call, which took place only a few minutes after Roberts ceased his pursuit. The time that elapsed was not long enough to permit Mr. Caldwell to compose himself such that he could misrepresent to his wife the events that had taken place. Indeed, this court has held that the passage of thirty minutes or even a few hours may be insufficient for a person who witnessed a startling event to be distanced enough from the event to misrepresent what happened. *Maggard v. Ford Motor Co.*, 320 F. App'x 367, 373 (6th Cir. 2009) (collecting cases). And Mr. Caldwell was still under the stress of the event when he called his wife, given that she described him as "fearful," "not calm," and speaking quickly. Thus, the district court did not err when admitting Candice Caldwell's statements.

Likewise, Mr. Caldwell's statements over the phone to Cicero also satisfy the excited-utterance exception. Mr. Caldwell called Cicero just after talking with his wife.Cicero described

---

[2]For the first time on appeal, Roberts also argues that Caldwell's texts with "Debbie Brown" and his statements during the recorded call with Roberts are inadmissible hearsay. Appellant's Br. at 16. We review for plain error, but no error occurred. Both sets of Mr. Caldwell's statements, the text messages and the phone call, were not offered for the truth of the matter asserted but as context for Roberts' own statements. *United States v. Whiteside*, 747 F. App'x 387, 398–99 (6th Cir. 2018).

Mr. Caldwell as "out of breath," "frantic," and "scared," indicating that her client was likely still under the stress of the event when they spoke, especially since their call lasted only a few minutes.  And when Mr. Caldwell arrived at the police station, the police officer noticed that Mr. Caldwell still seemed "shook up."   Given the brief nature of Mr. Caldwell's phone call with Cicero, along with Mr. Caldwell's excited state that lasted even after he arrived at the police station, he did not have enough time to regain composure.  Accordingly, the district court also did not err by admitting Cicero's testimony.

## C.  Roberts' Statements to Cicero

The application of attorney-client privilege is a mixed question of law and fact that this court reviews de novo.  *Automated Sols. Corp. v. Paragon Data Sys.*, 756 F.3d 504, 517 (6th Cir. 2014).  A claim of attorney-client privilege is governed by common law, as directed by Federal Rule of Evidence 501.  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  Because Roberts asserted the privilege, he bears the burden of establishing its application.  *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992).  His subjective belief that the attorney-client relationship existed must be objectively reasonable, given the circumstances.  Kenneth S. Broun et al., *McCormick on Evidence* § 88 (8th ed. 2022).

> The privilege has the following essential elements:
>
> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Fausek*, 965 F.2d at 129 (quoting *Humphreys, Hutcheson & Moseley v. Donovan*, 755 F.2d 1211, 1219 (6th Cir. 1985)).  "When a communication involves both legal and non-legal matters, we 'consider whether the predominant purpose of the communication is to render or solicit legal advice.'"  *Alomari v. Ohio Dep't of Pub. Safety*, 626 F. App'x 558, 570 (6th Cir. 2015) (quoting *In re County of Erie*, 473 F.3d 413, 420 (2d Cir. 2007)).  None of the elements of privilege are present here.  Because the predominant purpose of Roberts' communication was not to seek legal advice but was simply to provide information to Cicero about the custody dispute, no attorney-client relationship existed.  Roberts also knew Cicero represented Mr. Caldwell.  Cicero spoke

well: she reminded him on the call that she was not acting in a capacity as Roberts' legal adviser. In fact, Cicero encouraged Roberts to consult with his own attorney. And notably, Roberts did not intend for the conversation to remain confidential—he even asked Cicero to record the phone call—so his statements were never made in confidence, nor did he expect them to be permanently protected.

True, Cicero had represented Roberts in a couple of discrete, criminal matters over eight years earlier. But those representations had not created a perpetual attorney-client relationship, nor did they demonstrate that Cicero's actions violated her duties to a previous client. The Ohio Rules of Professional Conduct do not allow Cicero to (1) represent a different client in the same or substantially similar matter without the former client's informed, written consent; (2) use information relating to a prior representation against the former client without the former client's informed, written consent; or (3) reveal information related to the prior representation. Ohio R. of Prof. Conduct 1.9(a), (c) (2021). Cicero did none of those things, and thus did not violate any of her duties to Roberts.

## D.  Still Images Admitted at Trial

Admission of photographs or recordings during a trial is reviewed for abuse of discretion. *Farrad*, 895 F.3d at 875. A photograph is admissible if it is "an accurate representation of the scene depicted." *United States v. Hobbs*, 403 F.2d 977, 978–79 (6th Cir. 1968). In other words, the pictures must be "authentic, accurate[,] and trustworthy." *See United States v. Robinson*, 707 F. 2d 872, 876 (6th Cir. 1983).

While the admissibility of digitally enhanced still images appears to be a case of first impression for this circuit, several of our sister circuits have considered the issue and decided that enhanced video and recordings are admissible if (1) the enhancements were properly authenticated and (2) the analyst documented his steps when altering the source file. *See United States v. Seifert*, 445 F.3d 1043, 1045 (8th Cir. 2006); *see also United States v. Carbone*, 798 F.2d 21, 25 (1st Cir. 1986). Here, the analyst provided such documentation in a written report and saved copies of the images at each stage of enhancement. The analyst testified that the actual substance of the video was unaltered, even though Roberts claims, without any evidence,

that the analyst manipulated the still images, Appellant's Br. at 23–24. The district court independently reviewed these still images in chambers before ruling them admissible, showing that it considered the still images to be authentic, accurate, and trustworthy. Thus, the district court did not abuse its discretion by admitting these images, particularly considering its independent review of the analyst's work to ensure that the substance of the still images was authentic, accurate, and trustworthy.

## IV.

### A. Commerce Clause Challenge to 18 U.S.C. § 2261A

This court reviews Roberts' Commerce Clause claims for plain error because Roberts did not raise his objection to 18 U.S.C. § 2261A before the district court. *See Al-Maliki*, 787 F.3d at 791. For the first time on appeal, Roberts challenges 18 U.S.C. § 2261A, claiming it is an exercise of congressional power not permitted under the Commerce Clause. That provision allows Congress "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. 1, § 8, cl. 3.

This court, however, has already held that 18 U.S.C. § 2261A(1) is valid under the Commerce Clause because Congress "retains plenary power to regulate things and activity that cross state lines." *United States v. Al-Zubaidy*, 283 F.3d 804, 811 (6th Cir. 2002) (citing *United States v. Page*, 167 F.3d 325, 334 (6th Cir. 1999) (en banc)). The statute contains an "explicit jurisdictional element requiring interstate travel," and therefore it "falls well within Congress's plenary authority to regulate things and activities that cross state lines." *Id.* at 812. The evidence reflects that Roberts traveled across multiple states in preparation for, and to accomplish, his violent act against Mr. Caldwell, which directly contrasts with Roberts' claim that he committed only "intrastate violence." Appellant's Br. at 28. Roberts clearly "travel[ed] in interstate [commerce] . . . with the intent to kill, injure, harass, [or] intimidate" Mr. Caldwell, so the district court did not err by applying the statute for that charge. 18 U.S.C. § 2261A(1).

Nor did the district court err with respect to Roberts' charge under 18 U.S.C. § 2261A(2). That statute criminalizes someone who, "with the intent to kill, injure, harass, [or] intimidate . . . another person, uses the mail, any interactive computer service . . . or any other facility of

interstate or foreign commerce to engage in a course of conduct that" puts another "person in reasonable fear of the death of or serious bodily injury to a person." 18 U.S.C. § 2261A(2)(A). Because "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or person or things in interstate commerce, even though the threat may come only from intrastate activities," this statutory provision is constitutional. *United States v. Lopez*, 514 U.S. 549, 558 (1995).

Roberts cites *United States v. Morrison*, 529 U.S. 598 (2000), and *Kelly v. United States*, 140 S. Ct. 1565 (2020), to challenge the constitutionality of 18 U.S.C. § 2261A. This authority does not persuade us. *Morrison* addresses a statute that regulated certain intrastate actions because of their "substantial effects" on interstate commerce, but that statute lacked an express jurisdictional element. 529 U.S. at 611–12. In contrast, § 2261A regulates the channels or instrumentalities of interstate commerce and has an express jurisdictional hook. As for *Kelly*, that case is inapposite because it does not address a statute promulgated under the authority of the Commerce Clause. 140 S. Ct. at 1571–72.

## B. Multiplicity of 18 U.S.C. § 2261A Charges

Finally, Roberts raises a multiplicity challenge to being charged and sentenced under both subsections (1) and (2) of 18 U.S.C. § 2261A. Because he did not raise this objection below, we review it for plain error. *Ehle*, 640 F.3d at 694.

The test from *Blockburger v. United States*, 284 U.S. 299 (1932), governs multiplicity arguments. If each "charge requires proof of a fact that the other charge does not . . . then the charges accuse different crimes and are therefore not multiplicitous." *United States v. Myers*, 854 F.3d 341, 355 (6th Cir. 2017) (citing *Blockburger*, 284 U.S. at 299). Roberts' convictions under § 2261A(1) and § 2261A(2) are not multiplicitous because each conviction required proof of different facts. They thus constitute separate crimes.

Roberts' conviction under 18 U.S.C. § 2261A(2) was related to his course of conduct between August 1 and 5, 2017—in particular, the Jamestown incident. The Jamestown incident involved his convincing Mr. Caldwell to travel to a remote place by texting him as "Debbie Brown." And it also involved the dispute that followed in which Roberts threatened

Mr. Caldwell while visibly carrying a firearm.  In addition, for that count, Roberts had to use an instrument of interstate commerce—a cell phone.  In contrast, his conviction under 18 U.S.C. § 2261A(1) was based on his interstate travel between August 12 and August 15, 2017, that eventually led to his killing of Mr. Caldwell.

Roberts argues that *United States v. Shrader*, 675 F.3d 300 (4th Cir. 2012), works against this holding, but that case involved a defendant charged with two counts both under § 2261A(2).  Roberts was charged under two different provisions of § 2261A for separate crimes with different underlying facts.  Accordingly, the district court did not err.

## V.

For the foregoing reasons, we AFFIRM the district court's judgment of conviction.